Isaiah Levon **QUIROZ**, A Minor, by and Through Debra **QUIROZ**, as Parent and Next Friend, Appellant,

v.

**COVENANT HEALTH SYSTEM**, A Texas Corporation, Lubbock Methodist Hospital, A Texas Corporation, A & D Medical Center, L.L.C., A Limited Liability Company, and David William Davison, M.D., Appellees.

No. 08–05–00196–CV.

Court of Appeals of Texas, El Paso.

March 8, 2007.

Rehearing Overruled June 13, 2007.

Kathleen McCartan, Mueller Law Offices, Austin, for Appellant.

Jim Hund, Hund & Harriger, L.L.P., Lubbock, Michelle E. Robberson, Copper & Scully, Dallas, for Appellees.

Before CHEW, C.J., McCLURE, and BARAJAS, C.J. (Ret.).

## *OPINION*

ANN CRAWFORD McCLURE,
Justice.

This is another tragic birth asphyxia case. Following a jury trial, the trial court entered a take nothing judgment in favor of Covenant Health System, A & D Medical Center, L.L.C. and Dr. David Davison, M.D.[1] Debra Quiroz, as parent and next friend of her son Isaiah Levon Quiroz, filed a medical malpractice suit alleging the negligence of Covenant and Dr. Davison proximately caused her son's devastating and permanent brain injuries.[2] Quiroz challenges the factual sufficiency of the evidence to support the jury's verdict as well as several evidentiary rulings. For the reasons that follow, we affirm.

## FACTUAL SUMMARY

Isaiah was born in Ward Memorial Hospital on August 8, 1998. The hospital is a small county-owed facility in Monahans, Texas. Dr. Davison, the treating physician, attended Quiroz throughout her prenatal course without any problems. Isaiah was born by emergency Caesarean section with the umbilical cord wrapped tightly around his neck. Isaiah's skin was blue, he was not breathing, his heart rate was questionable, and his body was floppy. According to the medical record, he suffered from "hypoxic ischemic encephalopathy" and has cerebral palsy. Although Isaiah is expected to live into his seventies, he will never live independently or hold a job. He is not expected to walk on his own and his ability to communicate is severely limited.

## *Hospital Management Contract*

Quiroz alleged that Covenant's hospital manager had been negligent in operating the hospital and had contributed to Isaiah's injuries. The hospital is owned by Ward County and operates under the control of a hospital board of directors. The board is made up of members of the community, many of whom are farmers, ranchers, and local business people. In early 1998, the county considered closing the facility due to severe financial problems. After negotiating with several potential candidates, the hospital board of directors entered into a management agreement with Covenant on May 26, 1998. Covenant and the hospital were operating under this agreement seventy-four days later when Isaiah was born.

## *Fetal Heart Monitoring*

Our discussion of the events surrounding Isaiah's birth requires a basic understanding of fetal heart monitoring and the interpretation of monitor strips. A fetal heart monitoring machine is a mechanical device which, when attached to a laboring mother's abdomen, records both uterine contractions and the baby's heart rate. The two readings are produced simultaneously so that the physician can track how the baby's heart rate responds to the increased stress of labor. The uterus contracts during labor, putting pressure on the umbilical cord. Even in a normal labor pattern, the increased pressure causes the baby's heart rate to drop during contractions because there is less blood and oxygen moving through the cord from the placenta. According to expert testimony, fetal monitoring is the best way to evalu-

1. Covenant Health System is the product of a merger between predecessor in interest Lubbock Methodist Hospital, and St. Mary's Hospital.

2. Weigh of Life Clinics, L.L.P. a/k/a Family Medical Center of Monahans, P.A. was also named as a defendant but was non-suited pretrial.

ate the status of the baby as labor progresses.

The monitor's measurements are recorded on the monitor strip as continuous lines which rise and fall according to the baby's heart rate and uterine pressure. The monitor strip is divided into two parts. The top line measures the baby's heart rate. The bottom line, printed simultaneously, measures the pressure created by contractions.

The normal heart rate for a full term baby is between 110 and 160 beats per minute. A fetal heart rate in the normal range is called "reassuring." When the baby's heart rate drops below the normal range it is referred to as "nonreassuring." The longer and more frequently the heart rate drops, the more there is cause for concern. Changes in the baby's heart rate produce a "squiggly line" on the monitor strip, which is referred to as variability. The key to a normal monitor strip is that heart rate changes mirror the pressure of the contraction. The baby's heart rate should be at its lowest when the pressure of the contraction peaks; then, as the contraction subsides, the heart rate should recover.

The baby's heart rate can have both short-term and long-term variability. Short-term variability refers to the beat-to-beat changes in the heart rate. Long-term variability measures the number of large oscillations on the monitor strip in one minute. Long term variables are measured in relation to a baseline which is simply the average heart rate over a ten minute period without a contraction. An acceleration is a fifteen beat increase above the base line that lasts for at least fifteen seconds. Accelerations are positive news for the patient because they indicate there is plenty of oxygen flowing through the placenta. Concern develops when there is a variable deceleration and the

heart rate is slow to return to baseline. Because the goal is for the variables to match the contractions, a slow return to baseline indicates the baby is under stress and having trouble compensating for a lack of oxygen even as the contraction ends. Variable decelerations are usually associated with umbilical cord compression of some kind.

A late deceleration begins after the contraction starts. The low point of the deceleration occurs after the height of the contraction. This is called uteroplacental insufficiency. The amount of blood traveling through the placenta is insufficient to give the baby's heart enough oxygen to recover properly from the stress of the contraction. Without enough blood passing through the umbilical cord from the placenta, the baby develops hypoxia, a decrease of oxygen. The decreased blood flow is called "ischemia."

When the heart rate monitor shows signs of cord compression, the standard of care requires intrauterine resuscitation to relieve the pressure on the cord and restore blood flow. Methods to relieve cord pressure include repositioning the mother on her side or into the "Trendelenburg position," where her feet are higher than her head; pushing the baby's head back up into the birth canal; increasing fluids; and administering oxygen.

### Labor and Delivery

#### Presentation Until 7:50 a.m.

Quiroz presented at the hospital shortly after 2:45 a.m. on August 8, 1998. The fetal monitor machine began recording at 2:45 a.m., and the next couple of hours were relatively uneventful. She received an epidural for pain at 5:10 a.m.

At 6:40 a.m., the monitor strip showed a series of three or four contractions without

full uterine relaxation between, as well as late decelerations with slow returns. The baby was beginning to experience some stress but his body was able to compensate. From 7 a.m. until 7:15 a.m., there were additional long contractions without relaxation. The monitor recorded a late deceleration and a variable where the heart rate dropped down to 90 and was slow to return to the baseline. The return to baseline indicated again that although the baby was stressed, he was still compensating after the contractions.

Dr. Davison arrived at 7:15 and reviewed the chart and monitor strip. From 7:20 until 7:35, the decelerations became more frequent but were still not indicative of an emergency. Dr. Davison ordered the surgical scrub nurse to be called in to prepare for a C-section if needed.[3] The onsite nurses tried to relieve stress on the baby by repositioning Quiroz on her sides, administering oxygen, and stimulating the baby's heart rate though scalp massage.

Quiroz began pushing at 7:30. The monitor strip showed variable decelerations with each push, another indication of cord compression. Quiroz pushed for ten minutes and although the deceleration became more and more severe, the baby's heart rate continued to climb back to the baseline. The pattern repeated itself several times with moderate variability when the baby experienced compensatory tachycardia. His heart accelerated back to and above the baseline, which is an indication of hypoxia and severe stress.

### 7:50 a.m. Until Delivery

At approximately 7:50 a.m., the baby stopped descending through the birth canal and was in serious trouble. The scrub nurse clocked in at 8 a.m. Dr. Davison testified that he could not perform the C-section safely without the scrub nurse to assist him. Without a surgical option, Dr. Davison attempted to deliver Isaiah vaginally with the help of a vacuum extractor called the "Mity-vac." The device is designed to work as an alternative to forceps. The Mity-vac is made of a cup which attaches to the baby's head through light suction. A pump increases the suction during a contraction, allowing the physician to pull the baby through the pelvis. At the end of the contraction, the suction releases and the process starts again for another pull as the next contraction begins.

Dr. Davison applied the Mity-vac between 7:50 and 8:10, over the course of six contractions. He testified that on each of the first five pulls, he felt movement and believed Isaiah would be delivered any second. On the last pull, there was no movement and Davison ordered a C-section. As Quiroz was prepped for the move to the surgical unit, the baby's heart rate dropped dramatically and variability disappeared.

Whether Isaiah was delivered at 8:27 a.m. or 8:39 a.m. is disputed.[4] There are several notations in the medical records indicating that Isaiah was delivered at 8:27 a.m. There is also a notation on the fetal monitor strip that Quiroz was moved from the labor and delivery room to the operat-

---

3. The scrub nurse is a member of the surgical team. In addition to assisting the surgeon, she is responsible for opening and preparing the operating room for surgery.

4. According to Quiroz's causation theory, Isaiah's brain damage and cerebral palsy are the result of a negligent delay in performing

the emergency C-section. Quiroz relied on the notation "to the OR" shown at 8:27 on the monitor strip to argue that Isaiah was not delivered until some time between 8:34 and 8:43 "actual time." Her experts testified that the additional ten to seventeen minutes without sufficient oxygen was enough to cause Isaiah's injuries.

ing room at the same time.[5] According to the surgical record, Quiroz arrived in the operating room at 8:17; ten minutes before the monitor strip says she left labor and delivery. To complicate matters further, hospital staff members testified that in an emergency situation, there is no one person dedicated to charting the patient's progress and procedures. Much of the medical record was created after Isaiah was delivered and stabilized.

Dr. Davison testified that he made the decision to perform a C-section at 8:10 a.m. and the staff immediately began moving Quiroz to the operating room. Quiroz herself testified that once Dr. Davison made the decision, the staff "scrambled" to move her to surgery.

### Resuscitation and Diagnosis

Isaiah was delivered by emergency C-section with the umbilical cord wrapped tightly around his neck. Dr. Davison handed him to nurses Carlson and Collins to begin resuscitation. They immediately evaluated Isaiah for an APGAR score.[6] At one minute, Isaiah's APGAR score was one. His skin was blue, he had little to no muscle tone, and he was not breathing. The only point the staff recorded related to his heart rate, which was below sixty when the first measurement was taken. Most babies are born with an APGAR score of nine.

Carlson headed the resuscitation effort while Collins focused specifically on Isaiah's respiratory effort. Over the next few minutes, Isaiah was intubated and bagged to push oxygen into his lungs, and he was given chest compressions to stimulate his heart rate. Isaiah's second APGAR score was two, indicating the only change in condition was that his heart rate was over 100. His ten minute APGAR score was only four. Isaiah was slowly improving but remained severely depressed. The final APGAR score at fifteen minutes was six.

Once Isaiah's condition was stable, he was transferred to the NICU at Medical Center Hospital where he spent almost a month. The physicians diagnosed Isaiah as having suffered hypoxic ischemic encephalopathy sometime during or directly after birth. Hypoxic ischemic encephalopathy is a brain injury caused by a lack of oxygen and blood flow.

### Condition and Prognosis

Isaiah's prognosis is poor. He will be severely mentally and physically handicapped for the rest of his life. Developmentally, Isaiah is expected to remain in the bottom one percent of children his age. Although he has some motor function in his arms and legs, his weak torso limits his independent mobility to rolling and "bunny hopping" on the floor.[7] Isaiah cannot feed

5. There was also a problem with the internal clock on the fetal monitor machine. The machine's clock was approximately one hour and ten minutes behind the wall clock in the delivery room. Although hospital staff was aware of the discrepancy, it required the nurses to make handwritten notations on the monitor strip to record the "actual time."

6. APGAR scores include assessments in five different areas: respiratory effort, heart rate, reflex activity, muscle tone, and skin color. APGARs are assigned from 0-10, with points subtracted for lack of function in the five

categories. A zero APGAR score means the baby was born with no signs of life in any category; a ten means the baby was born fully functional. APGAR measurements are done at one, five, then, and fifteen minutes after birth.

7. Isaiah starts in a sitting position with his knees bent to his chest, lower legs off to the side. This is called a "w sit." From that position he can sit independently. "Bunny hopping" describes his ability to move across a surface by lunging forward from the w-sit and pushing his body with all four extremities.

himself. His family has to mash or use a blender to soften his food because he cannot chew and swallow on his own. He will require constant care for the rest of his life. His disabilities will prevent him from ever living independently.

### The Verdict

The court's charge included two separate broad form negligence questions. Question One asked: "Did the negligence, as that term is defined below, if any, of Covenant proximately cause the injury in question to Isiah [sic] Levon Quiroz?" Following Question One, the charge included the following instruction on negligence:

> In order to find Covenant negligent, you must find that: (1) Covenant undertook to render services to Ward Memorial Hospital which Covenant should have recognized as necessary for the protection of patients of Ward Memorial Hospital; (2) Covenant failed to exercise ordinary care in the performance of such specific undertaking; and (3) injury or harm to Isiah [sic] Quiroz as a patient of Ward Memorial Hospital was proximately caused by reliance of Ward Memorial Hospital upon Covenant's undertaking to perform such services.

Question Two inquired: "Did the negligence, if any, of Dr. David William Davison, M.D. proximately cause the injury in question to Isiah [sic] Levon Quiroz?" The jury answered "no" to both questions.

### FACTUAL SUFFICIENCY

■ In her first point of error, Quiroz challenges the jury's failure to find either defendant negligent. Factual sufficiency complaints concede conflicting evidence on an issue, but maintain the evidence against the jury's finding is so great as to make the finding erroneous. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex.App.-Amarillo 1988,

writ denied). Because Quiroz is challenging an adverse finding on which she had the burden of proof, she must demonstrate that the verdict is against the great weight and preponderance of the evidence. *Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 629 (Tex.App.-El Paso 2001, pet. denied). A factual sufficiency challenge requires us to examine all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Gonzalez v. El Paso Hosp. Dist.*, 940 S.W.2d 793, 796 (Tex.App.-El Paso 1997, no pet.). We may set aside a verdict only if the evidence is so weak, or is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We are not permitted to pass upon witness credibility, nor will we substitute our judgment for that of the jury even if the evidence would clearly support a different result. *Cruz*, 44 S.W.3d at 629. Rather, we will sustain the challenged finding if the there is competent evidence of probative force to support it. *Id.* The fact that we may conclude that the evidence preponderates toward an affirmative answer based on our review of the record is not an appropriate ground for reversal. *Id.* When the complaint is to the jury's failure to find a fact, we will only reverse when the *great weight* of the evidence supports an affirmative answer. *Id.*

### Covenant's Negligence?

■ As Question One was submitted, Covenant's alleged negligence was based on a negligent undertaking theory. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex.2000). Quiroz had the burden to prove: (1) Covenant undertook to render services to Ward Memorial Hospital which Covenant should have recognized as necessary for the protection of patients of the hospital; (2) Covenant failed to exercise ordinary care in the performance of

this specific undertaking; and (3) injury to Isaiah as a patient was proximately caused by the hospital's reliance upon Covenant's undertaking to perform such services. To reverse, we must determine that the negative answer was contrary to the overwhelming weight and preponderance of the evidence for each issue upon which Quiroz had the burden of proof. *Sprick v. Sprick,* 25 S.W.3d 7, 11 (Tex.App.-El Paso 1999, pet. denied).

The existence of an agreement between Covenant and the hospital board of directors is not in question. The controversy centered on what specific services Covenant agreed to provide. Quiroz argues that Covenant undertook to provide services specifically aimed at protecting the patients of the hospital. Her witnesses included James Wurts and Charles Brosseau. Wurts was a senior vice-president of Covenant Health System. He testified that the services Covenant provides to management clients includes technical assistance, quality management, educational programs, and evaluations. If asked, Covenant could also provide continuing education for staff, electronic referral and consultation, and research materials.

Brosseau was offered as an expert witness on health care management and hospital administration. He testified as to the standard of care applicable to hospital administrators. In his opinion, operational audits and risk assessment surveys are the primary activities for a prudent administrator in a new hospital, and Covenant's failure to take such actions breached the standard of care.

Assuming that this evidence establishes Covenant's undertaking to provide clinical services as Quiroz argues, the record contains evidence contrary to her characterization. The terms of the management agreement specify that the board would remain responsible for hospital operation, policy, and procedure. The board also retained exclusive responsibility for "all medical, professional and ethical affairs of Hospital," the power to review Covenant's operating decisions, and the power to repeal or change policies implemented by the administrator.

Dyer Moore was the chairman of the hospital board when the agreement was signed. He testified that the hospital's financial condition was so severe that the county considered closing the facility:

> We needed someone on [sic] an organization that was familiar with every facet of the hospital and could run it, every part of our hospital, because just about every part of the hospital was in bad shape in terms of either its finances or its structure, too many people from whatever patient load we had, and so we needed someone who could take over and run the hospital in a financially secure manner on a day-to-day basis.

Given the conflicting evidence, the jury could have reasonably inferred that although Covenant may have agreed to provide clinical and safety services to other clients, this particular agreement was limited to financial management, or that the agreement provided for the clinical services "if requested" and the board never made such a request. The jury's implied finding that Covenant did not undertake to provide patient safety services is not against the great weight and preponderance of the evidence. Without an affirmative finding on the issue of Covenant's undertaking, Quiroz failed to carry her burden of proof as to Covenant's negligence.

### *Dr. Davison's Negligence?*

 Quiroz next complains that the jury's answer to Question Two is clearly wrong and unjust "because it was based upon the inherently incredible testimony of

Dr. Davison." "Central to our system of justice is reliance on the fact-finder to resolve disputed issues of fact." *Horn v. Hefner*, 115 S.W.3d 255, 259 (Tex.App.-Texarkana 2003, no pet.), *quoting Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993). The jury observes all witnesses and determines the weight of an individual's testimony. *Dubree v. Blackwell*, 67 S.W.3d 286, 290 (Tex.App.-Amarillo 2001, no pet.). A jury is free to believe or disbelieve all or part of any witness's testimony. *Gabriel v. Lovewell*, 164 S.W.3d 835, 847 (Tex.App.-Texarkana 2005, no pet.). Even expert witnesses are subject to the jury's role as the judge of credibility and weight to be given testimony. *Blackwell*, 67 S.W.3d at 290. This remains true even in cases where the jury must be guided by expert opinion testimony. *Lovewell*, 164 S.W.3d at 847. Expert opinions are generally not binding on the trier of fact if more than one possible conclusion can be drawn from the facts. *Id.* In the face of conflicting evidence, including conflicting expert testimony, we cannot substitute our own judgment for that of the jury. *See Wyler Indus. Works, Inc. v. Garcia*, 999 S.W.2d 494, 499 (Tex.App.-El Paso 1999, no pet.).

Essentially, Quiroz contends that Dr. Davison failed to contradict the opinions of her expert witnesses. Dr. Davison testified as his own medical expert witness and maintained throughout trial that his treatment of Quiroz and Isaiah did not fall below the standard of care. Dr. Donald Coney appeared as Quiroz's obstetrical expert. He offered numerous examples demonstrating that Dr. Davison failed to abide by the standard of care. He opined that Dr. Davison's inability to define "deceleration" during his deposition was below the standard of care for a family practice doctor who delivers babies. Dr. Davison explained his lack of precision this way:

A: I didn't describe it right when I talked to Mr. Lyons. I know that, but I wasn't hung up on the exact definition of it. I was looking at the severity of that case, and then, in my mind, I was thinking that's talking about really worrisome decelerations would be below a hundred, so I answered him that way. I wasn't hung up on a textbook definition of what a deceleration was like I'm having to do here now.

Q: Okay. So that was just a loose definition at the time?

A: Yes, sir.

Dr. Coney also testified that a C-section should have been performed at 7:50 a.m., and that waiting for a scrub nurse to arrive was below the standard of care. Dr. Davison countered that he could not operate safely without the scrub nurse. He explained that the rest of the staff present that morning had individual jobs to do and were not available to take over the scrub nurse's duties. There was also evidence that none of the other staff members had the specialized training required to serve as a scrub nurse.

Next, Dr. Coney criticized Dr. Davison for using the Mity-vac for more than one pull. According to Dr. Coney, Dr. Davison should have recognized that the vacuum was having a negative impact on the baby's condition. Dr. Davison responded that although he recognized the nonreassuring heart rate patterns, he felt the baby's head move and believed Isaiah was going to be delivered vaginally until the last pull.

Quiroz also cites several instances where Dr. Davison's trial testimony differed from his deposition testimony. These assertions go straight to witness credibility and the weight to be given his testimony. *See McShane v. Bay Area Healthcare Group, Ltd.*, 174 S.W.3d 908, 916–17 (Tex.App.-Corpus Christi 2005, pet. filed)(using prior inconsistent statement in

former patient's medical record to impeach physician's credibility). That falls within the sole province of the jury. *Carr,* 867 S.W.2d at 28. We are not a fact finder; we are not permitted to pass upon witness credibility, nor will we substitute our judgment for that of the jury. *Cruz,* 44 S.W.3d at 629. The jury chose to believe Dr. Davison and gave his testimony greater weight than the other experts. *See Rubio,* 24 S.W.3d at 468. Because there is competent evidence to support the jury's negative answers, the verdict is not against the great weight and preponderance of the evidence. *See Cruz,* 44 S.W.3d at 629. We overrule Issue One.

## EVIDENTIARY ISSUES

### *Standard of Review*

■■■ We review evidentiary rulings for an abuse of discretion. *Sears, Roebuck & Co. v. Abell,* 157 S.W.3d 886, 897 (Tex. App.-El Paso 2005, pet. denied). A trial court abuses its discretion when it takes action without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). To prevail, Quiroz must show that the trial court's error was calculated to cause and probably did cause the rendition of an improper judgment. *Abell,* 157 S.W.3d at 897.

### *Parol Evidence*

■■ In Issue Two, Quiroz complains the trial court abused its discretion by excluding evidence concerning the management agreement between Covenant and the hospital.[8] At issue are portions of

the testimony of three witnesses and a collection of newspaper articles. Hospital administration expert Charles Brosseau was not permitted to testify on the issue of Covenant's obligations under the management agreement. Former board member Dyer Moore was not allowed to explain how the terms "manage" and "operate" were defined between the parties. Steve Holmes, who worked for Covenant as the administrator in charge of the hospital in 1998, was prevented from testifying as to Covenant's obligations of "supervising, managing and operating." The newspaper articles contained details of the negotiations between the hospital and Covenant before the management agreement was signed.

■■■ This evidence was extrinsic to the management agreement. Extrinsic evidence is admissible only after the trial court first determines that the contract is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.,* 907 S.W.2d 517, 520 (Tex. 1995); *Kelly v. Rio Grande Computerland Group,* 128 S.W.3d 759, 768 (Tex.App.-El Paso 2004, no pet.). Whether there is an ambiguity is a question of law for the court to decide in light of the circumstances present at the time the contract was signed. *Kelly,* 128 S.W.3d at 768. A contract can be ambiguous on its face, ("patent ambiguity") or as applied to the subject matter which it governs ("latent ambiguity"). *Id.* In the case of a latent ambiguity, extrinsic evidence is admissible for the purpose of applying the contract to the subject matter that it governs. *Nat'l Union Fire,* 907 S.W.2d 517, 520; *citing*

---

**8.** Paragraph III of the agreement states in part: "Hospital acknowledge and agrees that whereas System, through the Administrator, has accepted the function of supervising, managing and operating Hospital, except as specifically set fort herein to the contrary or as provided by law, System, through the Ad-

ministrator, is responsible for the operation of Hospital and for establishing and implements Hospital's operating policies and standards of operation, services, maintenance, pricing and other policies affecting Hospital or the operation thereof."

*Murphy v. Dilworth,* 137 Tex. 32, 151 S.W.2d 1004, 1005 (Tex.1941); *see also Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n,* 611 S.W.2d 706, 708 (Tex. Civ.App.-San Antonio 1980, no writ.). But the ambiguity must become evident before parole evidence of intent is admitted. *Nat'l Union Fire,* 907 S.W.2d at 521. In other words, extrinsic evidence of the parties' intent cannot be used to create an ambiguity. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex. 1996).

Here, the trial court determined the contract was unambiguous. Quiroz did not challenge that ruling at trial and she does not argue ambiguity now. Instead, she complains that the evidence was admissible to "explain the subject matter of the contract." She wanted to show how Covenant and the hospital board defined the terms "manage," "operate" and "supervise." But there is no evidence that the contracting parties disagreed over the definitions or applications of these terms during their relationship. Without some evidence of a latent ambiguity, the evidence was inadmissible. We overrule Issue Two.

### *Causation*

■ In Issue Three, Quiroz challenges the exclusion of expert testimony on causation. Her hospital administration expert was not allowed to opine that Isaiah's injury was foreseeable to a reasonable administrator. The trial court determined that without medical expertise, the witness did not have the requisite knowledge or experience to testify.

■ Rule 702 contains three requirements for the admissibility of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be scientific, technical, or require specialized knowledge; and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact issue. Tex.R.Evid. 702; *Burns,* 125 S.W.3d at 593, citing *E.I. du Pont de Nemours & Co. v. C.R. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). Whether an expert is qualified is a preliminary question for the trial court. *Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 410 (Tex.App.-Fort Worth 2003, no pet.). The proponent must prove the expert witness possesses special knowledge as to the actual subject on which he is offering an opinion. *Burns,* 125 S.W.3d at 593.

■ Quiroz offered Charles Brosseau as her expert on hospital administration. His administrative qualifications were extensive. Brosseau has a master's degree in Heath Care Administration and is board certified by the American College of Health Care Executives. He served as an administrator for several large hospitals and hospital systems in Texas. He has also worked as an administrative consultant for Washington D.C. General Hospital and the M.D. Anderson Cancer Network in Houston. But Brosseau is not a doctor and does not have medical training. Admissible expert testimony is limited to the scope of the expert's qualifications. *See Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996). The trial court must ensure "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Id.* The specific issue in this instance was whether a hospital administrator could have foreseen Isaiah's injury. To answer this question, a qualified expert needed more than a general understanding that the lack of oxygen has the potential to cause brain damage. *See Esquivel v. El Paso Healthcare Systems, Ltd.,* 225 S.W.3d 83, 90 (Tex.App.-El Paso 2005, no pet.)(holding that nursing expert was not qualified to testify on causation because she had no expertise in diagnosing the

alleged injury); *see also Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 248 (Tex.App.-San Antonio 2004, no pet.)(holding that registered nurse was not qualified to express opinion on cause of patient's death).

Brosseau's experience and training certainly gives him more than a lay person's understanding that administrative negligence can contribute to patient injury. But there is no evidence that he had any medical expertise in the diagnosis of brain injuries or how the specific administrative failures he identified could have contributed to one. His opinion was mere speculation and amounts to no evidence at all. *See Broders*, 924 S.W.2d at 153 (holding that general medical expertise did not qualify physician to testify on causation without proof that he had experience or training in neurosurgery); *see also Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 507 (Tex. App.-Fort Worth 2001, pet. denied)(qualification in general field of nursing was not sufficient for witness to testify on standard of care applicable to nursing home).

Quiroz cites *Mills v. Angel*[9] for the proposition that a hospital's negligence is not necessarily dependent on a doctor's negligence. *See Angel*, 995 S.W.2d at 267. It is true that a hospital's liability can be independent of a physician's negligence. *See id.* at 267–68. It does not necessarily follow, however, that an administrative expert without any medical training is qualified to testify that a permanent and debilitating brain injury was foreseeable. Quiroz still had to prove that Brosseau was qualified to give an opinion on this particular issue. *Broders*, 924 S.W.2d at 152; *Burns*, 125 S.W.3d at 593. This she failed to do. *See Broders*, 924 S.W.2d at 153.

Even assuming error occurred, it was harmless. Brosseau was not the only expert witness to testify on the issue of administrative foreseeability. Dr. Coney was permitted to testify on the cause of Isaiah's injuries.

Q: And is it foreseeable to those responsible for managing, operating, and supervising the labor and delivery unit of a hospital that babies may need resuscitation?

A: Yes.

Q: Is it foreseeable to those persons responsible for operating, managing, and supervising a hospital that the necessary personnel to perform a stat C-section should be available?

A: Yes.

Q: And that those—that could result in an increased length of time of hypoxia?

. . .

A: Yes.

Q: Yes. Is that opinion to a reasonable degree of medical probability?

A: Yes.

Brosseau's testimony would have been cumulative and not dispositive of the case. *See Able*, 35 S.W.3d at 617. Finding no abuse of discretion, we overrule Issue Three.

### Reliability of Expert Opinion

In Issue Four, Quiroz challenges the exclusion of Dr. Coney's opinion linking permanent brain injury and cerebral palsy. Rule 702 requires an expert's opinion to be both relevant and reliable. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). An opinion based on unreliable scientific data is inadmissible as it is nothing more than the expert's subjective belief or speculation. *Robinson*, 923 S.W.2d at 557. The trial court must deter-

---

9. Mills v. Angel, 995 S.W.2d 262 (Tex.App.-Texarkana 1999, no pet.)

mine not whether the expert's conclusions are correct, but only whether the analysis is reliable considering all the evidence. *Keo v. Vu,* 76 S.W.3d 725, 734 (Tex.App.-Houston [1st Dist.] 2002, pet. denied); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718–19 (Tex.1998). A trial court properly excludes expert testimony as unreliable if: (1) the foundational data underlying the opinion is unreliable; (2) the methodology used by the expert to interpret the underlying data is flawed; (3) notwithstanding the validity of the underlying data and methodology, there is an analytical gap in the expert evidence; or (4) the expert fails to rule out other plausible causes. *Allstate Texas Lloyds v. Mason,* 123 S.W.3d 690, 698 (Tex.App.-Fort Worth 2003, no pet.).

In *Robinson,* the Texas Supreme Court identified six non-exclusive factors to guide the trial court in determining the reliability of scientific expert testimony: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Robinson,* 923 S.W.2d at 557.

Quiroz intended for Dr. Coney to opine that Isaiah suffered from a prolonged lack of oxygen resulting in tissue damage while Dr. Davison waited to perform the C-section. Dr. Coney opined that after ten to seventeen minutes of oxygen depravation, brain tissue dies resulting in severe neurological damage and sometimes death. Underlying this opinion are Dr. Coney's assertions that (1) he could determine how long and to what degree Isaiah was deprived of oxygen based on the fetal monitor strips, and (2) he could determine the pH level or acidity of Isaiah's blood based entirely on clinical information in the medical chart.

The correlation between intrauterine oxygen depravation and brain damage is a complex issue which the medical community is struggling to understand. There was extensive discussion at trial about an article published by The American College of Obstetricians & Gynecologists and The American Academy of Pediatrics entitled *Neonatal Encelphalopathy and Cerebral Palsy; Defining the Pathogenesis & Pathophysiology* (the "Green Journal"). The *Green Journal* listed four essential criteria to determine when intrapartum hypoxia is sufficient to cause cerebral palsy. The first criteria requires evidence of fetal acidosis in umbilical cord blood obtained at delivery. Acidosis is the medical term used when the body's pH level drops below 7.2. At this level, the acid begins to kill cells and tissue. Blood pH levels are measured with a laboratory blood gas test. Isaiah's blood was not tested for a pH level.

During the *Robinson* hearing, Dr. Coney testified not only to the complexity of this issue but also about his lack of professional experience with similar injuries. His obstetrical experience with babies born with low APGAR scores was limited to birth and the first few hours of life. Although it was his practice to "keep up with" such patients, he could not remember delivering a baby with neurological damage related to hypoxic ischemic encephalopathy. He had no experience with babies born with a pH level below seven, and those born with low APGARs recovered rapidly. His clinical experience with long term hypoxic insults was limited to cases brought to his attention through the

review systems in the hospitals where he practiced. Dr. Coney also testified that in his practice he had always relied on laboratory analysis of umbilical cord blood for pH testing. There is no evidence that he has ever used his method of determining pH levels without a lab test in his medical practice.

Basic to the scientific method is the premise that conclusions are the *result* of analysis. *See Robinson,* 923 S.W.2d at 559. In other words, "coming to a firm conclusion first and then doing research to support it is the antithesis of this [scientific] method." *Robinson,* 923 S.W.2d at 559 *quoting Claar v. Burlington Northern R.R.,* 29 F.3d 499, 502–03 (9th Cir.1994). Without a blood gas test, Dr. Coney had to search the medical record for clinical indications that Isaiah's pH was below seven at birth. This goal-oriented reasoning is contrary to the foundation of the scientific method. *See Robinson,* 923 S.W.2d at 559.

There is no evidence that it is possible to determine a pH level in a new born without a blood gas test other than Dr. Coney's testimony that he could do so. There is also no explanation of how the fetal monitor strip and Isaiah's symptoms pointed to a low pH level other than Dr. Coney's statement that "the clinical manifestations of the infant at the time of delivery are certainly compatible with that finding." Even if we assume it is possible to determine the pH level and the length of the hypoxic episode by Dr. Coney's methods, there is no evidence that what the doctor believed could have happened to Isaiah

actually did happen. *Gammill,* 972 S.W.2d at 726.

With regard to the correlation between the length of hypoxic insult and permanent brain damage, Dr. Coney relied on several studies in forming his opinions. However, he did not produce the literature for trial and was not able to testify to the rates of error for the studies. Lack of supporting literature does not make and expert's opinion inherently unreliable. *Keo,* 76 S.W.3d at 735. But unlike the expert in *Keo,* Dr. Coney had no experience applying his methods in his medical practice. The trial court acted well within its discretion in questioning the reliability of his methodology without experience or authoritative literature to support it.

Finally, there is the question of the nonjudicial uses of the methodology. There aren't any. Dr. Coney has written on the subjects of intrapartum hypoxia, brain damage, and cerebral palsy only in the context of litigation While this factor alone will not render an expert's opinion unreliable *per se,* "opinions formed solely for the purpose of testifying are more likely to be biased toward a particular result." *Robinson,* 923 S.W.2d at 559. The trial court could properly consider that bias in determining the reliability of the opinion. *See id.* We overrule Issue Four.

### *Improper Questioning*

Issue Five raises the propriety of a question during the cross-examination of Dr. Coney when opposing counsel referenced his 4590i expert report.[10] We review an improper question under the same

---

10. When Quiroz filed this case, health care liability claims were subject to the provisions of TEX.REV.CIV.STAT.ANN. art 4590i, § 13.01. Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 1.01-12.01, 1977 TEX.GEN.LAWS 2039-53, repealed by Act of June 2, 2003, 78th Leg., R.C., ch. 204, § 10.09, 2003 TEX. GEN.LAWS 884. The current version is found at TEX.CIV.PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2006). Act of June 2, 2003, 78th Leg. R.S., ch. 204, § 10.01, 2003 TEX.GEN.LAWS 864 (effective date September 1, 2003). Because this suit was filed prior tot he effective date of the new Act, we will refer to the repealed law.

standard applied to improper jury argument. *See Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 120 (Tex.1984). Quiroz must show: (1) an error; (2) that was not invited or provoked; (3) that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; and (4) was not curable by an instruction, a prompt withdraw of the statement, or a reprimand by the judge. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839–40 (Tex.1979); *Cooper Tire & Rubber Co. v. Mendez,* 155 S.W.3d 382, 409 (Tex.App.-El Paso 2004), *rev'd on other grounds,* 204 S.W.3d 797 (Tex.2006).

Covenant's attorney asked Dr. Coney: "Now, even though you started to review the case in November of 2003, you formed your opinions in that month, November of 2003, and did some sort of a report back then, didn't you?" Quiroz's attorney objected that the report was a statutorily required medical expert report and was not admissible. *Patriacca v. Frost,* 98 S.W.3d 303, 304 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *see* Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 1.01–12.01, 1977 Tex.Gen.Laws 2039–53 (repealed 2003). The trial court sustained the objection, instructed the jury to disregard, and denied the motion for mistrial.

Quiroz complains that a mistrial was necessary because the harm was incurable. She must show that the probability the question caused harm is greater than the probability the jury decided the case based on proper proceedings and evidence. *Cooper Tire,* 155 S.W.3d at 410. We consider all the evidence to determine incurable harm. *Standard Fire Ins. Co.,* 584 S.W.2d at 839–40. To determine whether the nature, degree and extent of the improper question created an incurable error, we must consider how long it continued, whether it was repeated or abandoned, and whether there was cumulative

effect. *Standard Fire Ins. Co.,* 584 S.W.2d at 840.

The record includes the testimony of seventeen witnesses over two weeks of trial. The improper question is a single instance which defense counsel quickly abandoned. We are not persuaded that this arises to the level of incurable error. We overrule Issue Five. Having overruled all of issues for review, we affirm the judgment of the trial court.

BARAJAS, C.J. (Ret.), sitting by assignment, not participating.