Elizabeth QUIROZ, As Next Friend of Joseph Cardona a/k/a Joseph Quiroz, Appellant,

v.

Jorge Fabio LLAMAS-SOFORO, M.D., individually, and Jorge Fabio Llamas-Soforo, M.D., P.A., d/b/a El Paso Eye Care Center, Appellees.

No. 08–14–00073–CV

Court of Appeals of Texas, El Paso.

January 6, 2016

James Girards, The Girards Law Firm, Dallas, TX, for Appellant.

Diana L. Faust, Cooper & Scully, P.C., Dallas, TX, Jennifer G. Martin, Schell Cooley, LLP, Addison, TX, for Appellees.

Before McClure, C.J., Rodriguez, and Hughes, JJ.

## OPINION

STEVEN L. HUGHES, Justice

This is a medical malpractice case. Elizabeth Quiroz brought suit as next friend of her son, Joseph Cardona, against Dr. Jorge Fabio Llamas–Soforo, his professional association,[1] and others.[2] Quiroz alleged Dr. Llamas was negligent in screening and treating Joseph's retinopathy of prematurity (ROP) resulting in complete blindness in Joseph's right eye and minimal vision in his left. In particular, Quiroz alleged that Dr. Llamas failed to adequately evaluate Joseph's condition and to perform proper cryotherapy on Joseph's

eyes. The jury answered "no" to the question whether Dr. Llamas' negligence, if any, proximately caused Joseph's injury, and the trial court rendered a take-nothing judgment on the jury's verdict. On appeal, Quiroz contends the jury's finding is against the great weight and preponderance of the evidence, and also asserts the trial court committed various procedural errors requiring a new trial. We affirm.

## BACKGROUND

Joseph Cardona suffered a premature birth on August 9, 1998, when he was born to Elizabeth Quiroz as the second of twin sons. Joseph was born at 24 weeks' gestation,[3] weighed only 525 grams, and was at the limit of viability.[4] While all premature babies are "at risk," prematurely-born twins face additional difficulties in terms of viability.[5] Joseph had less than a 50 percent chance of survival at birth, and suffered from respiratory distress syndrome, hypocalcemia, hypernatremia, hyperbilirubinemia, bilateral inguinal hernia, intraventricular hemorrhage, periventricular leukomalacia, feeding problems, and sepsis—an "overwhelming infection" capable of damaging brain and body. Joseph was also diagnosed with cerebral palsy.

---

1. Jorge Fabio Llamas–Soforo, M.D., P.A., d/b/a El Paso Eye Care Center.

2. Quiroz also sued five other doctors and two other professional associations. One doctor was non-suited before trial. The trial court granted directed verdict in favor of three other doctors. The jury found the remaining doctor and his two related professional associations were not negligent, and the trial court rendered a take-nothing judgment in their favor. At Quiroz's request, we dismissed the appeal as to all the defendants other than Dr. Llamas–Soforo and his professional association.

3. A full-term pregnancy is 40 weeks.

4. At 24 weeks' gestational age, only 60 percent of a baby's body is developed. Half of babies born in 1998 at 24 weeks' gestation and weighing 525 grams or less did not survive. The risk to a baby born at less than 32 weeks weighing less than 1500 grams is considered extreme and includes, among other things, "unpreventable brain problems[.]"

5. Joseph suffered in utero from hypovolemia, a condition in which he donated blood through the placenta to his twin brother but did not receive an equal share in return. This event was a factor in Joseph having a birth weight lower than his brother, who weighed approximately 800 grams at birth.

As a premature infant, Joseph's risk for retinopathy of prematurity (ROP) was very high. ROP is a disease resulting from premature birth in which the blood vessels of the retina [6] develop abnormally. Left untreated, ROP can lead to retinal traction folds, retinal detachments, and blindness.

A premature infant's retina is not yet vascularized and has no blood supply. From being outside the womb, a premature infant's unvascularized retina sends a chemical signal to encourage vascularization to get an adequate blood supply. ROP develops when these blood vessels grow in an unorganized manner into the eye cavity, instead of along the back wall. Their outward growth into the eye cavity and its effects are described in ascending severity as stages 1 through 5, with stage 5 representing total detachment of the retina into the center of the eye. The location of the blood vessels is described according to the "zone" of the eye, with zone I being the inner circle, surrounded by zones II and III. Zone I is the most dangerous area because ROP can develop swiftly there, whereas ROP in zone II often has "a more benign course[.]" The quantity and location of ROP within a zone is described by "clock hours."

These abnormal blood vessels bleed and release proteins that produce fibrous bands and scar tissue that pulls the retina off center. If not timely treated, this "traction" leads to retinal detachment and limited or total loss of vision, depending on the degree of detachment.

ROP develops at a variable, non-linear rate, but most premature babies who develop ROP experience improvement without surgical treatment.[7] If untreated, ROP can blind the child in as little as a few days, or it may take a few weeks. Children born between 23 to 35 weeks gestation with a 500–gram birth weight can be blinded within one week if not timely treated. One of the complications of ROP is "plus disease," which occurs when blood vessels around the optic nerve are dilated, engorged and follow a tortuous route, and are more likely to break and bleed into the eye. Bleeding inside the eye can indicate possible "plus disease."

ROP is treated by ablation of the peripheral retina to eliminate the cells releasing the chemical stimulating abnormal blood vessel growth. Ablation can be accomplished through cryotherapy, also called cryosurgery, by freezing the tissue using a cryoprobe. The freezing occurs when the surgeon touches the probe tip to the outside of the eye, while looking inside the eye to see the ice ball that forms. Properly performed, cryotherapy causes minimal restriction of visual field and very little vision loss. It also leaves permanent scars. Incorrect cryotherapy can result in cataracts or retinal detachment. A study addressing the use of cryotherapy for ROP determined that infants receiving proper and timely treatment often experience good outcomes, but that cryotherapy treatment did not guarantee the avoidance of a bad outcome, including blindness. Dr. Llamas testified that 44 percent of the children who received timely and appropriate treatment during trials experienced a bad outcome. The American Academy of Pediatrics, the American Association

---

**6.** The retina is the light sensitive portion at the rear of the eye that captures and transmits images to the brain. At the center of the retina is the macula, the most sensitive area that provides the sharpest vision. To function properly, the macula must be centered in the rear of the eye and without obstruction by blood vessels.

**7.** One of Quiroz's expert witnesses testified that as many as 94 percent of babies who develop ROP will not need surgical treatment.

for Pediatric Ophthalmology and Strabismus, and the American Academy of Ophthalmology published a joint statement entitled, "Screening Examination of Premature Infants for Retinopathy of Prematurity," in which they suggested guidelines for screening infants at high risk for ROP. The guidelines, which were in effect when Joseph was born in 1998, recommended that infants with a birth weight of less than 1500 grams or with a gestational age of 28 weeks or less should have an ophthalmoscopic examination to detect ROP by an ophthalmologist, specifically one having experience in the examination of preterm infants. The guidelines suggested the examination be performed between 4 and 6 weeks' chronological age or between 31 and 33 weeks' postconceptional age (defined as gestational age at birth plus chronological age), as determined by the infant's attending pediatrician or neonatologist.

The guidelines provide that the scheduling of follow-up examinations is best determined by the findings of the first examination, and specify that if the retinal vasculature is immature and in zone II but no plus disease is present, follow-up examinations should be planned at approximately two to four week intervals until vascularization proceeds to zone III. For infants with ROP or immature vessels detected in zone I, the most dangerous zone, examinations should be at least every one to two weeks until normal vascularization proceeds to zone III or the risk of attaining threshold conditions has passed. Infants with "threshold disease" [8] should be considered candidates for ablative therapy within 72 hours of diagnosis.

An ROP examination is not benign. It is traumatic for a baby, whose eyes are very small. The procedure involves using an eyelid speculum to open the baby's eyes and a scleral depressor to press on the wall of the eye. The pressure placed on the eye may increase the infant's heart rate. The drops that are placed in the baby's eyes also may affect heart rate, as well as the stomach and digestion. The baby may stop breathing during the examination. For these reasons, according to Dr. Llamas, the guidelines suggest weekly rather than daily examinations because it is unreasonable to expose a baby to these risks on a daily basis.

Joseph, who was born on August 9, 1998, was 30 weeks' postconceptual age on September 21, 1998. That day, as requested by a neonatologist, Dr. Llamas, a retinologist, performed his initial examination of Joseph's eyes and found no ROP. Accordingly, the guidelines indicated that Joseph should be examined again in two to four weeks. Dr. Llamas examined Joseph ten days later on October 1, 1998. During this examination, Dr. Llamas discovered that Joseph had ROP in zone II but no "plus disease." Dr. Llamas noted that he would perform a follow-up examination in two weeks.

When Dr. Llamas returned two weeks later on October 15, 1998, he examined Joseph's brother, but after consultation with the neonatologist, determined that Joseph's follow-up examination should be delayed to the next week for Joseph's benefit because he was ill with a bacterial infection.[9] Consequently, Joseph was not examined for the three-week period between October 1 and October 23, 1998.

8. "Threshold disease" is defined as stage 3 ROP, zone I, or zone II in 5 or more continuous clock hours or 8 cumulative clock hours with the presence of "plus disease."

9. Dr. Llamas reviewed the hospital records regarding the blood culture taken, and described the gram-negative bacilli as a potentially "very, very dangerous" bacteria.

When Dr. Llamas performed his follow-up examination on October 23, 1998, he observed in the right eye, ROP stage 2, zone II from 10:00 to 8:00 clock hours, and ROP stage 3 from 8:00 to 10:00, and observed in the left eye, ROP stage 2, zone II, "360 degrees." Although the disease had progressed in Joseph's right eye, Dr. Llamas determined that treatment was not necessary because Joseph had not reached threshold disease.

Dr. Llamas examined Joseph six days later on October 29, 1998, and found that Joseph's condition had improved with increased vascularization "to the periphery" and only ROP stage 2 in zone II, "360, in both eyes," which he described as an improvement from the prior examination. Dr. Llamas considered this a "very good thing" because retinopathy improves when "vessels keep growing to the periphery and eventually they reach their goal and there is no need for treatment." When Dr. Llamas examined Joseph five days later on November 3, 1998, he found that Joseph continued having ROP stage 2 in zone II. These findings made Dr. Llamas optimistic. Because of this progress, Dr. Llamas decided to re-evaluate Joseph in two weeks.

When Dr. Llamas examined Joseph two weeks later on November 17, 1998, he observed a small hemorrhage in the back of the right eye, which he testified did not affect his ability to observe and evaluate the ROP. Because the hemorrhage was small, and the ROP was not yet at the stage of threshold disease, Dr. Llamas determined that he could safely wait one week to see how each of these conditions progressed. In the interim, Joseph underwent an unrelated surgical procedure.

On November 24, 1998, Dr. Llamas observed that the vitreous hemorrhage in the right eye had increased in size and was obscuring the area of ROP, which compromised Dr. Llamas' ability to see the ROP.

In the left eye, the ROP had increased in clock hours. Although no plus disease was present as indicated by the guidelines for proceeding with ablation therapy, Dr. Llamas determined that surgery should be performed because the present conditions were jeopardizing his ability to diagnose, observe, and treat the eyes.

Dr. Llamas performed cryosurgery on both of Joseph's eyes the next day, November 25, 1998. In Joseph's hospital chart, Dr. Llamas noted that he performed cryosurgery on both eyes with no complications and entered "pre-op" and "post-op" notes diagnosing "ROP Grade III" in both eyes. After cryosurgery, a baby's eyelids will swell and anti-inflammatory drops are administered for several days until the swelling reduces. Joseph's nurses noted in the medical records that Joseph's eyes swelled after the surgery, that anti-inflammatory drops were administered to his eyes for several days, and that the swelling eventually decreased.

Dr. Llamas next saw Joseph in his office eight days later on December 3, 1998, after Joseph had been discharged from the hospital. Dr. Llamas testified that he observed the scars resulting from the cryosurgery in both of Joseph's eyes. He also found the presence of pigment that is released after cells are frozen, indicating the cells that were affected. Dr. Llamas felt the "cryo response" was good.

Dr. Llamas saw Joseph again two weeks later on December 17, 1998. On that occasion, he found Joseph had "cicatricial" ROP Stage 3 in the right eye and found "good cryo response" in the left eye. Dr. Llamas testified that ROP has an active or acute phase, and then a "cicatricial" or "inertia" phase. Although the acute phase of ROP may be stopped by surgery, Dr. Llamas testified that the cicatricial phase of ROP continues much like that of a train whose brakes have been applied but whose remaining inertia keeps the train in motion

for a period. There is no treatment for cicatricial ROP, and patient observation is continued to determine "how far the inertia of the disease goes[.]" If ROP reaches stage 4 where there is retinal detachment, a scleral buckle may be inserted, and if stage 5 occurs, a vitrectomy is performed. Dr. Llamas also testified that performing cryotherapy is no guarantee the disease will cease, and cryosurgery does not stop vitreous hemorrhage. Dr. Llamas determined that Joseph did not need an additional surgical procedure to remove Joseph's vitreous hemorrhage because the hemorrhage was not obscuring Joseph's view.

Joseph had a follow-up appointment scheduled to see Dr. Llamas but did not return for that follow-up visit. Instead on January 8, 1999, Joseph's mother took him to see Dr. Violeta Radenovich, an El Paso pediatric ophthalmologist. Dr. Radenovich diagnosed Joseph with bilateral temporal detachments between the macula and the optic nerve. Dr. Radenovich referred Joseph to a retina specialist in Houston, Dr. Ronan O'Malley. Dr. O'Malley examined Joseph three weeks later on February 1, 1999, and found that Joseph had bilateral detachments with large folds in both eyes and observed cicatricial ROP at the back of the lenses in both eyes.

Ten years later, Joseph's mother filed suit against Dr. Llamas. Trial of the suit involved the testimony of multiple expert witnesses, some testifying on behalf of Joseph and others on behalf of Dr. Llamas regarding the applicable standards of care and the timeliness and appropriateness of Dr. Llamas' examinations and treatment of Joseph's eyes.

## DISCUSSION

### The Adverse Finding on Negligence and Causation

Joseph presents four issues on appeal. In Issue One, Joseph contends the jury's "no" finding in favor of Dr. Llamas is against the great weight and preponderance of the evidence. We disagree.

### Standard of Review

When a party had the burden of proof on an issue at trial and challenges the factual sufficiency of the jury's verdict against it on appeal, the party must demonstrate that the verdict is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 82 (Tex. App.—El Paso 2007, pet. denied). We must consider and weigh all of the evidence, and we can set aside a verdict only if the evidence is so weak, or is so against the great weight and preponderance of the evidence, that the verdict is clearly wrong and unjust. *Dow Chemical Co.*, 46 S.W.3d at 242. We are not permitted to pass upon witness credibility, nor will we substitute our judgment for that of the jury even if the evidence would clearly support a different result. *Quiroz*, 234 S.W.3d at 82. Rather, we will sustain the challenged finding if there is competent evidence of probative force to support it. *Id.* The fact that we may conclude that the evidence preponderates toward an affirmative answer is not an appropriate ground for reversal. *Id.*

### Analysis

Quiroz faces significant hurdles to overturn the jury's finding of no negligence. She had the burden of proof to establish that Dr. Llamas breached the applicable standard of care and that the breach proximately caused Joseph's injury. *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). And, Quiroz had to meet this burden through expert testimony. *See Am.*

*Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 876 (Tex.2001) ("Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases."); *see also Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries.").

▬▬ Further, the jurors were the sole judges of the credibility of the witnesses and the weight to be given their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex.2005). Accordingly, the jurors were essentially free to choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819; *Quiroz*, 234 S.W.3d at 84. We must assume the jurors decided all credibility questions in favor of the verdict if reasonable human beings could do so. *City of Keller*, 168 S.W.3d at 819. Moreover, even expert witnesses are subject to the jury's role as the judge of credibility and the weight to be given their testimony. *Quiroz*, 234 S.W.3d at 84. Expert opinions are not binding on the trier of fact if more than one possible conclusion can be drawn from the facts. *Id.* In the face of conflicting evidence, including conflicting expert testimony, we cannot substitute our own judgment for that of the jury. *Id.*; *see Wyler Indus. Works, Inc. v. Garcia*, 999 S.W.2d 494, 499 (Tex.App.—El Paso 1999, no pet.).

### Screening

▬▬ Quiroz contends that Dr. Llamas was negligent because he failed to ascertain and follow an appropriate examination schedule. Quiroz does not claim that Dr. Llamas failed to meet the published screening guidelines for ROP. Indeed, the evidence demonstrated that Dr. Llamas' screening of Joseph's condition fell within the guidelines. Dr. Llamas testified extensively at trial about the applicable screening guidelines and his compliant course of examinations, findings, and treatment. With the exception of the one three-week gap in Joseph's treatment occasioned by Joseph's bacterial infection, Dr. Llamas' examination schedule comported with the recommendations in the screening guidelines that follow-up examinations occur within two to four weeks when retinal vasculature is immature, in zone II, and no plus disease is present. Dr. Llamas' follow-up examinations, with that one exception, occurred within one to two weeks, and none occurred at a four-week interval, nor was "plus disease" evident, even at the time Dr. Llamas decided to perform cryotherapy.

Quiroz argues that the guidelines were only a baseline for screening and did not supplant the need to assess each patient individually. She contends that Joseph was in the "highest possible risk category" for ROP, and that Dr. Llamas was required to screen more frequently than recommended by the guidelines. In particular, she asserts that when Dr. Llamas observed bleeding in Joseph's eye at the November 17 examination, he should not have waited another week before performing cryotherapy. She claims the jury's failure to find this conduct constituted negligence was contrary to the overwhelming weight of the evidence. We disagree.

There was evidence supporting the jury's implicit finding that the published screening guidelines supplied the relevant standard of care, and that Dr. Llamas' adherence to the guidelines was not negligence. In Dr. Llamas' opinion, he was not negligent in screening because he followed

the guidelines. And, one of Dr. Llamas' experts, Dr. Rudin, also testified that based on the guidelines, Joseph did not need any screenings other than those provided by Dr. Llamas. Indeed, Dr. Rubin testified that the cryotherapy treatment Dr. Llamas performed on Joseph was, if anything, early because at the time of the treatment, Joseph had not yet meet the criteria set by the guidelines for cryotherapy intervention.

Quiroz contends that because Dr. Llamas was a named defendant with a self-interest to present testimony establishing a favorable standard of care, his testimony should be deemed to carry no weight, or less weight than the testimony of the other experts. We disagree.

■■ Like many medical malpractice cases, this record contains conflicting expert opinions. That Dr. Llamas testified on his own behalf does not negate the weight that the jury could give to his testimony. *See Thota v. Young*, 366 S.W.3d 678, 695–96 (Tex.2012) (jury could have reasonably believed the defendant doctor's opinions and discounted the opinions of the plaintiff's experts). Even expert witnesses are subject to the jury's sole role as the judges of credibility and the weight to be given their testimony. *Quiroz*, 234 S.W.3d at 84. Dr. Llamas' own testimony was sufficient to establish the applicable standard of care and that he was not negligent. *See Thota*, 366 S.W.3d at 696; *see also Wilson v. Scott*, 412 S.W.2d 299, 303 (Tex.1967) (defendant physician's own testimony can establish the standard of care).

In the face of conflicting evidence, including conflicting expert testimony, we cannot substitute our own judgment for that of the jury. *Quiroz*, 234 S.W.3d at 84. We find nothing in this record demonstrating any reason why the jury could not reasonably choose to believe the testimony of Dr. Llamas and his expert Dr. Rudin that the guidelines provided the applicable standard of care. Nor do we find any evidence demonstrating that the jury could not (1) properly accept and infer from the testimony of Dr. Llamas and his experts that Dr. Llamas appropriately followed the screening guidelines and timely determined when to perform cryotherapy on Joseph, and (2) properly reject any contrary testimony and opinions of Quiroz's experts.

*Ineffective Cryotherapy and Scarring*

■ Quiroz also contends that Dr. Llamas failed to meet the standard of care by performing "ineffective" cryotherapy treatment. Quiroz asserts that there was a dispute at trial whether Joseph's eyes showed the permanent scarring that would have resulted from cryotherapy, and the two doctors who examined Joseph months later saw no such scars. And, these two doctors—Drs. Radenovich and O'Malley—found retinal detachments, cataracts, and "end stage" ROP. Quiroz argues that because timely and proper treatment avoids a bad visual outcome in most cases, the jury could not reasonably infer that Dr. Llamas timely or properly treated Joseph given the undisputed evidence of Joseph's condition only weeks after Dr. Llamas performed the cryotherapy procedure.

■ Quiroz's contention that Dr. Llamas did not perform effective cryotherapy relies in part on the fact that Joseph suffered a bad result following cryotherapy. However, " '[a] finding of negligence may not be based solely on evidence of a bad result to the claimant in question[.]' " *Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 758–59 (Tex.App.—Dallas 2015, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2) (West 2011)); *see also Palacios*, 46 S.W.3d at 880 (breach cannot be inferred from the existence of an

injury alone because the doctrine of res ipsa loquitor does not generally apply in medical malpractice cases); *Vandestreek v. Hammer*, No. 03–99–00355–CV, 2000 WL 963162, at *5 (Tex.App.—Austin July 13, 2000, no pet.) (not designated for publication) ("That Courtney sustained injuries as a result does not alone determine that Dr. Hammer violated the standard of care."); *Hunter v. Robison*, 488 S.W.2d 555, 560 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.) ("a physician is not a warrantor of cures, and his failure to cure is no evidence of negligence on his part").

Further, the evidence was mixed whether, as asserted by Quiroz, timely and proper treatment avoids a bad visual outcome in most cases. Dr. William Good, a pediatric ophthalmologist, testified that 94 percent of all babies who develop ROP, regardless of weight or gestational age, will not need treatment for the condition. Dr. Llamas testified that blindness is preventable in 90 percent of cases with ROP treatment. The screening guidelines note, however, that treatment for ROP was associated with only an "approximately 50% reduction in the occurrence of posterior retinal traction folds and/or detachments." Dr. Rubin testified that 30 out of every 100 babies treated for ROP will end up blind despite the treatment. The jury also heard testimony from both Dr. Good and Dr. Llamas that 44 percent of the babies in the cryotherapy study who received good and timely treatment experienced bad visual outcomes. Even Dr. Good testified that he informed the parents of his patients that ROP treatment provides closer to a 50 percent chance of a better outcome, but never guarantees a good outcome. Dr. Good agreed that he had timely screened and treated babies who, despite his best efforts, had disastrous outcomes including bilateral retinal detachments.

Moreover, Dr. Llamas testified that although the acute phase of ROP may be stopped by surgery, the cicatricial or inertial phase of ROP continues. There is no treatment for cicatricial ROP, and patient observation is continued to determine "how far the inertia of the disease goes[.]" And, Dr. O'Malley admitted that even after cryotherapy, the condition can continue to progress and result in a bad outcome for the patient.

Consequently, the jury had before it evidence that ROP treatment, even when considered "effective," does not insure avoidance of retinal detachments or bad visual outcomes such as blindness. From this evidence, the jury could have reasonably concluded that Joseph was one of those babies who suffered a bad visual outcome despite proper cryotherapy.

Likewise, the evidence was in conflict whether Joseph's eyes exhibited the scarring that occurs after proper cryotherapy. Dr. Radenovich, who is not a retina specialist, testified that she did not observe the scars in the eyes which cryosurgery leaves. However, Dr. Radenovich's own medical notes twice indicate that cryosurgery had been performed, and fail to state whether she did or did not observe cryosurgery scars during her examinations of Joseph in 1999. In fact, Dr. Radenovich's notes from 2005 and 2006 affirmatively indicate the presence of bilateral chorioretinal scars. Dr. Rubin testified that the scars that Dr. Radenovich observed could have been caused only by bilateral cryotherapy surgery. Dr. Rubin also testified that Dr. Radenovich could not have observed scars from untreated ROP (rather than scars resulting from ROP treatment[)], as she claimed, because left untreated, ROP does not scar the choroid of the eye.

Dr. O'Malley also testified he did not see cryosurgery scarring in Joseph's eyes, but admitted that he also did not note the

absence of cryotherapy scars in Joseph's medical chart at the time he examined Joseph's eyes. Dr. O'Malley also failed to note whether Joseph had a past history of cryotherapy. Moreover, in his correspondence to Dr. Radenovich, Dr. O'Malley never mentioned the absence of cryotherapy scars.[10]

Dr. O'Malley also testified that Joseph's retinal detachment was not "truly Stage 5" as a portion of the retina was still attached, and agreed that because the retina was folded or wadded up, portions of the retina were not visible. Dr. Antonio Capone, a retina specialist, testified that O'Malley may have had difficulty seeing evidence of cryotherapy due to Joseph's retinal detachment and the retina's folded "funnel configuration," and because his view may have been blocked by the colored detached retinal material, which can restrict the ability to see evidence of cryotherapy treatment. Dr. Rubin explained that cryotherapy scars will be visible, but only provided the retina is reattached and the doctor is able to view the area where the cryotherapy was applied. Thus, the jury was informed that a physician's testimony that he did not observe cryotherapy scars is not necessarily evidence that the scars do not exist.

Importantly, Dr. Llamas testified that he performed the cryosurgery treatment in both of Joseph's eyes and observed the resulting scars that occurred, as well as the "pigment" that is released after cryosurgery for ROP. We find nothing in the record that would have made it improper for the jury to conclude from this testimony that cryotherapy scarring was present in Joseph's eyes and to infer that Dr. Llamas had performed effective cryotherapy surgery.

Dr. Good opined that Dr. Llamas was negligent in treating Joseph and such negligence proximately caused Joseph's vision loss. Dr. O'Malley explained that he was "not stating that [Dr. Llamas] was negligent" but only that he would have "done it" differently. Drs. Rubin and Capone opined that Dr. Llamas was not negligent in his care and treatment of Joseph, that he used ordinary care in treating Joseph, and that no act or omission by Dr. Llamas was a proximate cause of injury to Joseph.

Given the conflicting evidence in this complex medical malpractice case, it was within the province of the jury to weigh the credibility of these expert witnesses, to resolve the conflicts in their testimony in favor of Dr. Llamas, and to conclude that Joseph failed to meet his burden of proving Dr. Llamas breached the applicable standard of care. Because the jury's finding is not against the great weight and preponderance of the evidence, Issue One is overruled.

**Exclusion of Photographs of the Eye**

In Issue Two, Quiroz contends the trial court abused its discretion in excluding photographs of Joseph's left eye that had been taken a few months before trial.

In order to authenticate the photographs for admission, Quiroz offered the testimony of Eric Kegley, the custodian of records for the medical provider who had

10. In support of Drs. Radenovich and O'Malley, Quiroz argues that the jury could not reasonably infer from a silent record that cryotherapy scars were in fact present, and that the only reasonable inference from Dr. Radenovich's medical records as a whole was that she simply mistakenly noted the presence of chorioretinal scarring. We disagree. But as discussed below, in any event, the jury could have reasonably accepted Dr. Llama's direct testimony that he observed the scarring in Joseph's eyes after cryotherapy, and properly determined that the retinal detachments prevented Drs. Radenovich and O'Malley from observing that scarring.

taken the photographs. Quiroz contends the trial court abused its discretion by not allowing Kegley to testify to authenticate the photographs, thereby effectively excluding the photographs from evidence.

Quiroz asserts these photographs would have provided the only objective evidence showing whether cryotherapy scars were present and would have confirmed whether Dr. Llamas had properly performed the cryotherapy procedure consistent with the standard of care. Quiroz argues the photographs went to the heart of the case and their exclusion allowed the defendants to mislead the jury as to why Joseph became blind. Quiroz planned to use the photographs to cross-examine Dr. Llamas and his experts "with concrete, undisputable proof of the actual condition of Joseph's eyes."

### Standard of Review

The trial court's decision to admit or exclude evidence is reviewed under the abuse of discretion standard. *See Enbridge Pipelines (East Texas) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex.2012); *Holmes v. GMAC, Inc.*, 458 S.W.3d 85, 98 (Tex.App.—El Paso 2014, no pet.).

### Analysis

■ We conclude Quiroz has waived any error by failing to make an offer of proof showing how Dr. Llamas and his experts would have answered any proffered questions when cross-examined about the photographs. Without an offer of proof of their expected testimony, this Court cannot determine whether the exclusion of the photographs was harmful error.

■ To preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court. *Perez v. Lopez*, 74 S.W.3d 60, 66 (Tex.

App.—El Paso 2002, no pet.); *see Johnson v. Garza*, 884 S.W.2d 831, 834 (Tex.App.—Austin 1994, writ denied). While the reviewing court may be able to discern from the record the nature of the evidence and the propriety of the trial court's ruling, without an offer of proof, we can never determine whether exclusion of the evidence was harmful. Thus, when evidence is excluded by the trial court, the proponent of the evidence must preserve the evidence in the record in order to complain of the exclusion on appeal. TEX. R. EVID. 103(a)(2); *Perez*, 74 S.W.3d at 66; *see Weng Enterprises, Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 221 (Tex.App.—Houston [1st Dist.] 1992, no writ). Compliance with the evidentiary rules on an offer of proof preserves error for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(B); *Perez*, 74 S.W.3d at 66.

The reason an offer of proof is required is explained in *Anderson v. Higdon*, 695 S.W.2d 320 (Tex.App.—Waco 1985, writ ref'd n.r.e.):

> When tendered evidence is excluded, whether testimony of one's own witness on direct examination or testimony of the opponent's witness on cross-examination, in order to later complain it is necessary for the complainant to make an offer of proof on a bill of exception to show what the witness' testimony would have been. Otherwise there is nothing before the appellate court to show reversible error in the trial court's ruling.

*Id.* at 325; *see also Garcia*, 999 S.W.2d at 511.

Quiroz's argument on harm relies not on the photographs themselves, the significance of which, Quiroz admits, would have been required to be established by expert analysis and interpretation of the photographs. Rather, Quiroz's harm analysis is based on her contention that her counsel's

use of the photographs in the cross-examination of Dr. Llamas and his experts would have undermined their opinions that the cryotherapy procedure performed by Dr. Llamas was effective.

But, Quiroz has not shown what questions her counsel would have asked in cross-examining Dr. Llamas and his experts. Presumably, her counsel planned to get Dr. Llamas and his experts to admit that the photographs did not show any cryotherapy scarring, and that cryotherapy scarring would still be visible in photographs taken in 2013, and then to use those admissions to undermine their opinions that the cryotherapy performed by Dr. Llamas was effective. We do not know, however, what questions counsel intended to ask. More important, we do not know how the witnesses would have responded. They might have made the admissions Quiroz was seeking. Or, they might have testified that the photographs did show scarring, or that photographs taken in 2013 would not show scarring that had occurred fifteen years earlier.

Without those answers, we cannot determine whether the exclusion of the evidence probably caused the rendition of an improper judgment and can be the basis for reversible error. TEX. R. APP. P. 44.1(a)(1); *see Perez*, 74 S.W.3d at 66–67 (holding that appellant waived error concerning the trial court's refusal to allow questioning concerning defendant's knowledge of risks posed by providing an operational firearm to a minor, when appellant failed to make an offer of proof showing how defendant would have answered the proffered questions). Issue Two is overruled.

## Exclusion of Testimony of Dr. Radenovich

In Issue Three, Quiroz contends the trial court abused its discretion when it did not allow Dr. Radenovich to explain why she had referred Joseph to an out-of-town retina specialist, Dr. O'Malley. Dr. Radenovich was asked on redirect examination by Quiroz's counsel why she did not refer Joseph to a local doctor. When Dr. Llamas objected, Quiroz's counsel informed the trial court that counsel for Dr. Llamas had opened the door by implying that Dr. Radenovich's action in referring Joseph to an out-of-town specialist had contributed to Joseph's visual impairment by delaying the examination of his eyes, counsel explained that he wanted to clarify that Dr. Radenovich had not done anything wrong.[11] The trial court disagreed, observing that Dr. Llamas' counsel had not so implied, but rather had implied that Dr. Radenovich had referred Joseph to the out-of-town specialist, Dr. O'Malley, because he was a doctor with whom she had proctored. The trial court expressed its fear that by asking an open-ended question, Dr. Radenovich would say something derogatory, and ruled that counsel would not be permitted to ask the question. No offer of proof was made regarding the substance of Dr. Radenovich's anticipated answer to the question.

 To preserve a claim of error regarding a trial court's exclusion of evidence, the party must inform the trial court of its substance by an offer of proof,

---

11. Dr. O'Malley testified that when a baby has a detached retina but a normal macula as Dr. Radenovich noted in Joseph's chart, and the baby is not promptly examined by a retina specialist for a scleral buckle (a procedure that tends to have a much higher likelihood of successful retina reattachment than for a baby who reaches stage 5 detachment), ROP can progress and result in conditions he observed in Joseph. Dr. O'Malley noted that there were many retina specialists performing scleral buckles in El Paso in 1999, but he was not aware whether Dr. Radenovich sent Joseph to a retina specialist in El Paso.

unless the substance was apparent from the context. TEX. R. EVID.103(a)(2). In the absence of an offer of proof, any error in excluding the evidence is not preserved for review. *See Katy Intern., Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 96 (Tex.App.—Houston [14th Dist.] 2014, pet. denied); *Bobbora v. Unitrin Ins. Services*, 255 S.W.3d 331, 334 (Tex.App.—Dallas 2008, no pet.) (to preserve error concerning exclusion of evidence, complaining party must actually offer evidence and secure adverse ruling). Further, as discussed above, without an offer of proof of the expected testimony, we cannot determine whether the trial court's exclusion of the evidence was harmful. *See Perez*, 74 S.W.3d at 66–67; *see also In re A.M.*, 418 S.W.3d 830, 840 (Tex.App.—Dallas 2013, no pet.). Because Quiroz failed to make an offer of proof regarding Dr. Radenovich's anticipated testimony, she has failed to preserve this issue for our consideration. Issue Three is overruled.

**Improper Jury Argument**

▪ In Issue Four, Quiroz contends the trial court erroneously permitted Dr. Llamas to present jury argument suggesting her trial counsel, Mr. Girards, had manufactured an issue—the absence of cryosurgery scars in Joseph's eyes—"after the fact." Quiroz contends that this jury argument, coupled with the defendants' efforts to impugn Dr. O'Malley by suggesting that Dr. O'Malley provided his opinion regarding the absence of cryotherapy scars only after being paid, renders the argument incurable and requires that we reverse the trial court's judgment. We conclude the jury argument did not rise to the level of criticism of counsel, and in any event, any error has been waived.

### Standard of Review

■ Control over counsel during closing argument is within the sound discretion of the trial court and will not be disturbed without a clear showing of abuse of that discretion. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Soto*, 819 S.W.2d 619, 624 (Tex.App.—El Paso 1991, writ denied).

### Analysis

During closing argument, Llamas' counsel, Ms. Fraley, noted that Dr. Radenovich twice documented in her charts that Dr. Llamas had performed cryosurgery on Joseph, but also noted that neither Dr. Radenovich nor Dr. O'Malley documented in their charts that cryosurgical scarring was *not* observed in Joseph's eyes; nor did Dr. O'Malley indicate a lack of scarring in his post-surgery letter to Dr. Radenovich. Ms. Fraley then reminded the jury of Dr. O'Malley's admission in his testimony that his records did not contain any comments regarding the absence of the cryosurgery scars:

> [MS. FRALEY:] Fast-forward 15 years. What did Dr. O'Malley tell you? "I went to Houston and met with him." He said, "Yeah, we talked about what was in my records. And there's nothing in my records about the absence of cryo marks." Then Mr. Girards comes and for the first time ever—
>
> MR. GIRARDS: Your Honor, I'll object. Can we approach the bench?
>
> THE COURT: Yes.
>
> (At the Bench, on the record)
>
> MR. GIRARDS: It's absolutely inappropriate under published case law for Counsel to go after opposing counsel in front of the jury. She's criticizing me. It's reversible error.
>
> MS. FRALEY: I'm criticizing Dr. O'Malley.
>
> MR. GIRARDS: It's reversible error. I ask the Court to instruct Ms. Fraley not to go where she's clearly going.

THE COURT: Please go ahead and just establish the source of the comment as Dr. O'Malley, if that's where it is.

MS. FRALEY: You bet. Okay.

Dr. Llamas' counsel then continued her argument to the jury saying, "Then Dr. O'Malley for the first time anywhere says, 'I didn't see cryo.'" Dr. Llamas' counsel proceeded to argue that while Dr. Radenovich had documented bilateral chorioretinal scars, she was under the belief that Dr. O'Malley had performed surgery in the choroid whereas Dr. O'Malley had performed surgery at the retina, and reminded the jury that choroid scarring occurs only when surgery is performed, and that Dr. Llamas was the only physician who performed surgery in the choroid of Joseph's eyes.

■ It appears the trial court determined that counsel for Llamas may have mistakenly referred to "Mr. Girards" when she meant to say "Dr. O'Malley." This is evidenced by Ms. Fraley's explanation to the court that she was referring to Dr. O'Malley, and the court's instruction to "[p]lease go ahead and just establish the source of the comment as Dr. O'Malley, if that's where it is." Allowing counsel to clarify a mistaken reference would not be an abuse of discretion.

In any event, we conclude the complained-of argument does not rise to the level of impermissible or incurable criticism of counsel. First, due to counsel's prompt objection, Ms. Fraley's reference to Mr. Girards was incomplete—"Then Mr. Girards comes and for the first time ever—." There was in fact no criticism of Mr. Girards presented to the jury. Second, Ms. Fraley promptly explained to the jury that she was criticizing Dr. O'Malley. Ms. Fraley's arguments therefore were not an attack on counsel, but rather constituted fair comment on and criticism of Dr. O'Malley's testimony and his credibility as

a witness. *See Dyer v. Hardin*, 323 S.W.2d 119, 127 (Tex.Civ.App.—Amarillo 1959, writ refused n.r.e.) (counsel may fairly and reasonably criticize a witness and his testimony as justified by the record, and may comment upon the bias or interest of parties and witnesses).

■ Further, the trial court did not expressly rule on Mr. Girards' objection, but rather simply directed Dr. Llamas' counsel to "just establish the source of the comment as Dr. O'Malley, if that's where it is." And, to the extent the trial court implicitly made a ruling, Joseph's counsel did not request the trial court to instruct the jury to disregard the objected-to argument. Appellate complaints of improper jury argument must ordinarily be preserved by timely objection and a request for an instruction that the jury disregard the improper remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex.2009); *see also Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–41 (Tex.1979); *Rhey v. Redic*, 408 S.W.3d 440, 465 (Tex.App.—El Paso 2013, no pet.). The only exception is a complaint of incurable argument, which may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *Phillips*, 288 S.W.3d at 883; *Rhey*, 408 S.W.3d at 465; Tex. R. Civ. P. 324(b)(5). Quiroz filed a motion for new trial. However, she did not raise improper jury argument as a basis for seeking a new trial.

Therefore, even if the objection made by counsel was proper, Quiroz failed to obtain an adverse ruling from the trial court. Further, if Quiroz did obtain an adverse ruling, she failed to request the trial court to instruct the jury to disregard. Moreover, Quiroz failed to raise incurable argument as a basis for new trial. For these reasons, Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.