

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00300-CV

———————————————

TEXAS HEALTH CARE, P.L.L.C. AND TIMOTHY J. JONES, D.O., Appellants

V.

E.D., A MINOR, BY AND THROUGH HER PARENTS, B.O. AND D.D., AS
NEXT FRIENDS, Appellee

———————————————

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-293099-17

———————————————

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

In this interlocutory appeal,[1] we consider an obstetrician's amended expert report[2] asserting that a hypothetical telephonic cross-examination of an attending labor and delivery nurse with a documented inability to accurately interpret the diagnostic tracings of a fetal heart rate monitor[3] would nevertheless have disclosed to the interrogating obstetrician a state of fetal distress that would have prompted the immediate delivery of the monitored baby, thereby avoiding the hypoxic ischemic encephalopathy,[4] cerebral palsy,[5] and quadriplegia[6] she ultimately suffered. Appellants

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9).

[2] *See id.* § 74.351(a), (c).

[3] *See Quiroz ex rel. Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 78 (Tex. App.—El Paso 2007, pet. denied) ("A fetal heart monitoring machine is a mechanical device which, when attached to a laboring mother's abdomen, records both uterine contractions and the baby's heart rate. The two readings are produced simultaneously so that the physician can track how the baby's heart rate responds to the increased stress of labor. The uterus contracts during labor, putting pressure on the umbilical cord. Even in a normal labor pattern, the increased pressure causes the baby's heart rate to drop during contractions because there is less blood and oxygen moving through the cord from the placenta."); *Morrell v. Finke*, 184 S.W.3d 257, 262 (Tex. App.—Fort Worth 2005, pet. denied) ("A fetal heart monitor strip is read at regular and frequent intervals to determine whether the baby's heart rate reflects 'hypoxia,' a deficiency of oxygen reaching the tissues of the body that could lead to depletion of the baby's oxygen reserves over time, resulting in brain damage."); *Cruz ex rel. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 625 (Tex. App.—El Paso 2001, pet. denied) ("Readings from a fetal heart monitor can reveal, among other things, whether the baby is in danger due to oxygen deprivation, known as hypoxia.").

[4] "Hypoxic ischemic encephalopathy" is "a severe, permanent brain injury caused by a lack of oxygen and blood flow." *Cornejo v. Hilgers*, 446 S.W.3d 113, 116 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Quiroz*, 234 S.W.3d at 81 (same).

Texas Health Care, P.L.L.C. (Texas Health) and Timothy J. Jones, D.O., the hypothetical telephonic interrogator, contend that this liability theory is both conclusory and speculative and that the trial court abused its discretion by denying their motion to dismiss the health care liability claims of the baby, appellee E.D., by and through her mother and father, B.O. and D.D., as next friends (the Parents). Because we agree, we reverse the trial court's denial of their motion to dismiss and render a judgment dismissing these vicarious and direct liability claims with prejudice.

## Factual Background

On February 6, 2014, E.D.'s twenty-five-year-old mother was admitted to Texas Health Harris Methodist Hospital Southwest Fort Worth (Harris Methodist Southwest) for induction of labor after a healthy, uneventful full-term pregnancy. After admission, at 19:01,[7] the mother received the medication Cervadil to ripen her cervix for delivery. At 19:02, the nursing staff began fetal heart rate monitoring to

[5]"Cerebral palsy is a motor disfunction due to damage to the brain." *Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 766 (Tex. App.—Dallas 1993, writ denied).

[6]"Quadriplegia" is a "paralysis of all four extremities." *Nat'l Cty. Mut. Fire Ins. v. Howard*, 749 S.W.2d 618, 621 (Tex. App.—Fort Worth 1988, writ denied).

[7]Because the Parents' amended expert report, from which we draw our recitation of the facts, references time using the twenty-four-hour-clock system, or military time, we do so as well.

assess the baby's toleration of labor. At 19:03, Dr. Jones ordered the incremental administration of Pitocin[8] to induce and encourage labor.

The following day, at 13:53, the mother received epidural anesthesia. At 14:40, her membranes were artificially ruptured and clear amniotic fluid was observed. At the time of the membrane rupture, her cervix was noted to be dilated three centimeters and seventy-five percent effaced.

Approximately four hours later, at 18:22, Dr. Jones started the mother on a high-dose Pitocin protocol. Performing a sterile vaginal examination at 20:33, he observed the mother's cervix to be dilated five centimeters and ninety percent effaced. From the initiation of fetal heart rate tracing to this point in time, E.D.'s heart rate was "generally reactive,"[9] but it had exhibited occasional periods with diminished variability and no accelerations.[10]

---

[8]"Pitocin is a medication commonly used to stimulate labor by making the uterus contract more forcefully causing stronger and longer contractions." *Med. Ctr. of Se. Tex., L.P. v. Melancon*, No. 09-16-00449-CV, 2019 WL 2182480, at *2 (Tex. App.—Beaumont Feb. 28, 2019, pet. denied) (mem. op. on reh'g).

[9]"A reactive or reassuring [fetal heart rate] strip is one with a normal baseline, moderate variability, and accelerations." *Trowbridge v. United States*, 703 F. Supp. 2d 1129, 1133 (D. Idaho 2010).

[10]As explained in *Quiroz*, a

baby's heart rate can have both short-term and long-term variability. Short-term variability refers to the beat-to-beat changes in the heart rate. Long-term variability measures the number of large oscillations on the monitor strip in one minute. Long term variables are measured in relation to a baseline which is simply the average heart rate over a ten

4

From 20:33 to 22:00, the fetal heart rate tracing showed that E.D.'s heart rate transitioned from generally reactive and reassuring to nonreassuring because of minimal or absent variability and "absent accelerations." Although observing and charting this transition, Lan Tran, R.N., the labor and delivery nurse caring for the mother, twice increased the dosage of Pitocin but did not contact Dr. Jones to inform him of the transition. At 22:00, she gave the mother Tylenol to reduce a slight fever of 100.2 degrees. Nurse Tran finally called Dr. Jones at 22:29 and "notified him of the patient's condition."

Having received new orders from Dr. Jones at 22:29, at 22:50, Nurse Tran initiated interventions including administering oxygen to the mother. Continuing the administration of oxygen and maintaining the same dosage of Pitocin, she continued to chart minimal variability of the fetal heart rate from 22:50 to 23:40.

From 23:40 to 23:48, the fetal heart rate tracing exhibited three "clear deep variable decelerations." Nurse Tran did not chart any of them. Instead, she charted

---

minute period without a contraction. An acceleration is a fifteen beat increase above the baseline that lasts for at least fifteen seconds. Accelerations are positive news for the patient because they indicate there is plenty of oxygen flowing through the placenta. Concern develops when there is a variable deceleration and the heart rate is slow to return to baseline. Because the goal is for the variables to match the contractions, a slow return to baseline indicates the baby is under stress and having trouble compensating for a lack of oxygen even as the contraction ends. Variable decelerations are usually associated with umbilical cord compression of some kind.

234 S.W.3d at 79.

that the variability had improved from "minimal" to "moderate." She continued the oxygen and Pitocin but did not call Dr. Jones. At 23:49, Nurse Tran observed that the mother's cervix was dilated eight and one-half centimeters and was one hundred percent effaced.

From 23:50 to 23:57, the fetal heart rate tracing exhibited three more serious deep variable decelerations. Although Nurse Tran continued to chart the fetal heart rate as showing moderate variability, she paged Dr. Jones at 23:57 to report the interventions she had administered to the mother and her interpretation of the fetal heart rate tracing. Within a minute or two of her report, she observed the presence of variable and late decelerations,[11] but she continued to chart the fetal heart rate as exhibiting moderate variability. She continued the same dosage of Pitocin and did not call Dr. Jones back.

At midnight, the fetal heart rate suddenly dropped from a baseline of approximately one hundred fifty beats per minute to below fifty, a condition known

---

[11]Late decelerations

begin[] after the contraction starts. The low point of the deceleration occurs after the height of the contraction. This is called uteroplacental insufficiency. The amount of blood traveling through the placenta is insufficient to give the baby's heart enough oxygen to recover properly from the stress of the contraction. Without enough blood passing through the umbilical cord from the placenta, the baby develops hypoxia, a decrease of oxygen. The decreased blood flow is called "ischemia."

*Id.*

6

as fetal bradycardia.[12] At 00:04, Nurse Tran initiated additional interventions, including administering a fluid bolus, turning the mother from her left to her right side, and discontinuing the administration of Pitocin. At 00:06, she notified the charge nurse[13] "of the very concerning situation," who in turn called Dr. Jones and asked him to come to the bedside.

Dr. Jones arrived at the bedside at 00:11, approximately four or five minutes after the charge nurse's call. Although it is not clear whether Dr. Jones ordered a STAT[14] cesarean section delivery of the baby when called around 0:06 or upon his arrival at the bedside, the mother was transferred to the operating room for the surgery at 00:13. Dr. Jones delivered the baby at 00:20, fourteen minutes after being informed of fetal bradycardia. Unfortunately, the baby was severely depressed with APGAR scores of 0, 1, and 2 at one, five, and ten minutes, respectively,[15] and with acidotic[16] umbilical blood gasses "consistent with a full cord occlusion."

---

[12]"'Bradycardia' refers to a heart rate typically below 120 beats per minute." *Cruz*, 44 S.W.3d at 625.

[13]The record does not show what this nurse's title or function was, but the Parents' amended expert report states that she was "presumably" the charge nurse. We will refer to her as such in this opinion.

[14]Stat means "emergency." *Saade v. Villarreal*, 280 S.W.3d 511, 515 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (op. on reh'g).

[15]"APGAR scores include assessments in five different areas: respiratory effort, heart rate, reflex activity, muscle tone, and skin color. APGARs are assigned from 0–10, with points subtracted for lack of function in the five categories. A zero APGAR score means the baby was born with no signs of life in any category; a ten means the

Subsequent difficulty in intubating the baby complicated efforts at resuscitation. The baby was transferred to Cook Children's Medical Center with a discharge diagnosis of hypoxic ischemic encephalopathy. Her eventual diagnosis included cerebral palsy and quadriplegia.

## Procedural Background

On July 7, 2017, the Parents sued Dr. Jones, Texas Health, Nurse Tran, and Harris Methodist Southwest, among others, for medical negligence in the care and treatment of the mother and E.D. and asserted health care liability claims on E.D.'s behalf.

### Pleadings

More specifically, the Parents alleged that Dr. Jones was negligent in

A. Failing to monitor the patient's fetal monitoring strips and properly and timely treat the patient accordingly[;]

B. Failing to discontinue the use of Pitocin in the face of signs of increasing fetal distress[;]

C. Failing to examine the patient at the bedside during her labor[;]

D. Failing to properly communicate with and ask questions of [Nurse Tran] that would yield an accurate picture of the patient's condition[;]

---

baby was born fully functional. APGAR measurements are done at one, five, ten, and fifteen minutes after birth." *Quiroz*, 234 S.W.3d at 81 n.6.

[16]Acidotic refers generally to acid build up. *See Morrell*, 184 S.W.3d at 268 n.10; *see also infra* note 20, defining "acidosis" more specifically.

E. Failing to elicit a proper report of the patient's deteriorating condition during the 22:29 phone call [with Nurse Tran] on February 7, 2014[;]

F. Failing to deliver the patient by vacuum extraction or cesarean section prior to the fetal bradycardia and asphyxia[;]

G. Failure to record and sign the cesarean section operative note in a timely fashion[; and]

H. Failing to order antibiotics when the patient's temperatures reached 100.1 and 100.2.

The Parents further alleged that Texas Health was vicariously liable for Dr. Jones's negligence.

Critically, the parents alleged that Nurse Tran[17] was negligent in

A. Failing to monitor the patient's fetal monitoring strips and properly and timely treat the patient accordingly[;]

B. Failing to discontinue the use of Pitocin in the face of signs of increasing fetal distress[;]

C. Failing to properly communicate the patient's condition to [Dr. Jones;]

D. Failing to call Dr. Jones between 20:33 and 22:00 on February 7, 2014 to report non-reassuring fetal heart tracing[;]

E. Increasing the Pitocin level from 22 to 28 between 20:33 and 22:00 on February 7, 2014 rather than discontinuing the administration of Pitocin[;]

F. Failing to properly report the patient's deteriorating condition during the 22:29 phone call to Dr. Jones on February 7, 2014[;]

_____

[17]The Parents' claims against Nurse Tran are not before us in this appeal, but we recite them here because they inform our analysis.

G. Failing to request that Dr. Jones come to evaluate the patient at 22:29 on February 7, 2014 or to access the nursing chain of command in order to obtain a physician's bedside evaluation[;]

H. Failing to discontinue the use of Pitocin at 22:50 when the patient required supplemental oxygen and the variability was minimal[;]

I. Failing to chart three deep variable decelerations between 23:40 and 23:48 and recording instead that the variability ha[d] gone from minimal to moderate[;]

J. Failing to chart three deep decelerations from 23:50 to 23:57 and failing to report these decelerations to Dr. Jones[;]

K. Failing to call Dr. Jones after seeing variable and late decelerations between 23:58 and 00:00 and charting moderate variability[;]

L. Failing to discontinue Pitocin in light of these repetitive decelerations[;]

M. Failing to call Dr. Jones at 00:00 on February 8, 2014 when the fetal heart rate rapidly dropped from 150 to 50 and failing to call him for seven minutes thereafter[; and]

N. Failing to move the patient to the operating room despite the obvious need for an immediate cesarean section.

As with Texas Health and Dr. Jones, the Parents alleged that Harris Methodist Southwest was vicariously liable for Nurse Tran's negligence. The Parents further alleged that both Nurse Tran's and Dr. Jones's negligence proximately caused E.D.'s severe and permanent injuries.

**Expert Report**

To support their pleadings, the Parents served the expert reports and *curricula vitae* of Garrett Burris, M.D., a pediatric neurologist; James Balducci, M.D., an

10

obstetrician/gynecologist; and Edward Karotkin, M.D., a neonatologist. Neither Dr. Burris's nor Dr. Karotkin's reports addressed the care provided by Dr. Jones and Nurse Tran to E.D. and the mother during labor and delivery. After sustaining Dr. Jones and Texas Health's objections to Dr. Balducci's original report, as well as Harris Methodist Southwest and Nurse Tran's objection, the trial court granted the Parents a thirty-day window to cure the report's deficiencies.

The Parents subsequently filed and served an amended expert report authored by Dr. Balducci. After setting forth his qualifications[18] and the relevant medical and hospital records he had reviewed, Dr. Balducci recounted, as set forth above, the factual circumstances of the mother's labor leading to E.D.'s eventual delivery by STAT cesarean section.[19]

---

[18]Dr. Balducci is a physician who is board certified in obstetrics and gynecology and maternal–fetal medicine. His practice "involves the assessment, management and treatment of expectant mothers, laboring mothers and mothers undergoing vaginal and cesarean delivery." At hospitals where he has admitting privileges, he has variously served as a professor teaching obstetrics, the chief of the department of obstetrics, and the chair of the obstetrical quality assurance committee; the latter position involved medical peer review of obstetrical care. His familiarity with the standards of care applicable to labor and delivery nurses and obstetricians "comes from [his] active practice, teaching, hospital and clinic roles as well as [his] ongoing participation in professional education and medical literature reviews." None of the defendants challenged Dr. Balducci's qualifications as set forth in his amended expert report.

[19]While it is true that our recitation of the factual circumstances described in this opinion are drawn, as they must be, from the "four corners" of Dr. Balducci's amended expert report, *see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001), it is doubtful that his observations and opinions would be understandable to a lay judge or factfinder. At the beginning of his amended report,

11

Addressing Nurse Tran's and Dr. Jones's care, Dr. Balducci asserted,

> The standard of care applicable to the labor and delivery nurses, including Nurse Tran, requires the nurses to recognize the abnormalities of the fetal heart rate and to promptly and accurately communicate with the obstetrician.
>
> [The mother] was a low-risk patient . . . admitted for an induction. The patient did well through the early labor[;] however by 22:00, the standard of care required that fetal heart tracings be recognized by Nurse Tran to have become extremely concerning and required Nurse Tran to call for assistance or call Dr. Jones to evaluate. Nurse Tran violated the standard of care by failing to recognize the abnormalities of the fetal heart rate, including minimal/absent variability and absent accelerations. It is my expert opinion that Dr. Jones should and/or would have

---

Dr. Balducci gives a brief explanation of hypoxia, ischemia, and hypoxic ischemic encephalopathy:

> Hypoxia means reduced oxygen in blood and or tissue and ischemia means reduced blood flow to the body or some part of the body. These are often used somewhat interchangeably since lack of oxygen delivery is the end result of either. Hypoxic/ischemic encephalopathy means that the brain has shown signs of being injured by the lack of oxygen.

Thereafter, he employs medical and technical terminology to describe both (1) the diagnostic symptoms, conditions, and complications of the mother's labor and delivery and (2) the nursing, medication, and medical interventions made the subject of his observations and opinions. Unfortunately, he does not provide definitions or explanations for their medical significance. Although this may be a commendable attempt at brevity, absent the footnoted definitions and explanations borrowed from the decisions of this and other courts—for example, for "late decelerations," *see* note 11, *supra*—it is unlikely a lay judge or jury would be able to determine the merits of the health care liability claims he seeks to support. Texas Health and Dr. Jones complain of this "terminology" deficiency on appeal but failed to do so in the trial court. Because we need not reach whether an expert report may comply with the professional requisites of medical peer review but nevertheless fail to establish a health care liability claim's legal merit under Section 74.351(a), we have provided the footnoted definitions and explanations to facilitate a lay understanding of the issues addressed.

decided to deliver the baby at that time by cesarean section for a non-reassuring fetal heart tracing with delivery occurring within 30 minutes of the decision. Had Nurse Tran complied with the standard of care and notified Dr. Jones, more likely than not, Dr. Jones would have delivered the baby by approximately 22:30, which would have prevented the asphyxia and acidosis that the baby suffered.

Nurse Tran did not timely notify Dr. Jones, and the prolonged hypoxia continued. At 22:29, the records indicate that Nurse Tran called Dr. Jones. The standard of care required Nurse Tran and Dr. Jones to communicate accurately about the fetal heart rate. The standard of care required Nurse Tran to report to Dr. Jones the fetal heart rate variability and absent accelerations and also required Dr. Jones to obtain that information from Nurse Tran.

Dr. Jones had an obligation under the standard of care to ask questions to obtain a full and accurate picture of his patient's status when speaking with Nurse Tran in the hours prior to this STAT delivery, including:

1. What is the variability of the fetal heart tracings? Has the variability changed?

2. Are there any accelerations or decelerations in the fetal heart tracings?

3. How many decelerations?

4. How frequent are the decelerations?

5. How deep are the decelerations?

6. What is the baseline of the fetal heart rate?

Nurse Tran and Dr. Jones violated the standard of care by failing to communicate accurate information about the fetal heart tracing. Dr. Jones had to get accurate information from Nurse Tran or evaluate the fetal heart tracing personally. Had Nurse Tran and Dr. Jones complied with the standard of care, Dr. Jones should have determined that the variability had changed and was minimal and that there were no accelerations. Based on the fetal heart rate tracing at 22:30, he should have gone to see the patient and, based upon the fetal heart rate tracing,

13

should have decided to do a c-section delivery by 23:50 which would have prevented the asphyxia, acidosis and injury.

At 23:40 the tracing began to show deep variable decelerations and in fact developed into a bradycardia at or about 00:00. The standard of care required Nurse Tran to make Dr. Jones aware, but he was not made aware until 23:57 at which time precious time to prevent hypoxia and asphyxia was lost. Nurse Tran did not chart what information she provided to Dr. Jones in the phone call; however, based on her charting she did not correctly identify the variable decelerations and minimal to absent variability. Nurse Tran violated the standard of care by failing to call Dr. Jones about the severe variable decelerations and minimal to absent variability at 23:40 and of the bradycardia at 00:00. This prevented Dr. Jones from intervening with a c-section to prevent asphyxia and acidosis. She did not recognize the severe decelerations and continued minimal/absent variability as stated above. It was not until [the charge nurse] got involved at 00:06 that Dr. Jones was notified at 00:06–07 of the need to come to bedside.

Nurse Tran demonstrates by her charting and her failure to call Dr. Jones a critical lack of understanding concerning fetal heart tracing interpretation and management. The Hospital had an obligation under the standard of care to provide qualified and trained Labor & Delivery nurses at the bedside who are competent to identify these abnormalities and notify the doctor. The standard of care also requires the Hospital to properly educate, train, evaluate and supervise these nurses to accomplish this. Based on Nurse Tran's charting of incorrect assessments of the fetal heart rate and her failure to timely call Dr. Jones, the Hospital failed to provide a properly trained labor and delivery nurse in violation of the standard of care.

When Dr. Jones arrived at the bedside at 00:11 there already had been 15–20 minutes of bradycardia and acidosis.[20] He delivered the baby by STAT cesarean section at 00:20. That is approximately 13–14 minutes from being notified and approximately 9 minutes from arrival. Had the patient been taken to the OR [operating room] before his arrival then it is likely the delivery would have been even 2 minutes sooner.

---

[20]"Acidosis is the medical term used when the body's pH level drops below 7.2. At this level the acid begins to kill cells and tissue. Blood pH levels are measured with a laboratory blood gas test." *Quiroz*, 234 S.W.3d at 88.

14

This two minute delay was a further result of miscommunication between Dr. Jones and the Labor Nurses and was below the standard of care. Specifically, when Dr. Jones was called at 00:06, had he properly inquired about the status of the fetal heart tracings by asking about the variability, accelerations and decelerations, and baseline, he would have or should have ordered that the patient be taken to the OR immediately, resulting in delivery 2 minutes sooner. Similarly, had the nurses properly informed Dr. Jones during that call of the grave status of the fetal heart tracings, he would have or should have ordered that the patient be taken to the OR immediately, resulting in delivery 2 minutes sooner. When the baby is exposed to asphyxia and acidosis, every minute matters. This delay contributed to cause the asphyxia, acidosis and injury.

As to whether any of the breaches of the standard of care recounted by Dr. Balducci proximately caused E.D.'s ultimate cerebral palsy and quadriplegia, his amended report concluded:

> Had accurate information been provided, Dr. Jones would have or should have come in to evaluate his patient in person much sooner[,] which would have led to an earlier delivery and avoided this harm. Failed communication between health care providers is a leading cause of death and injury in the Hospital setting in the United States and this case is an example of that. In this respect, Nurse Tran, the Hospital and Dr. Jones share the responsibility for their failed communication and their failures to adhere to their respective standards of care combined to cause this avoidable injury.
>
> The standard of care required that the decision to deliver be based on an urgent need approximately 2 hours prior, but they failed to do that and allowed the urgent situation to develop into that of a STAT need for delivery. By 22:00, the standard of care required that Nurse Tran recognize the abnormalities of the fetal heart rate and call Dr. Jones. Had Dr. Jones been notified, more likely than not, he should and would have delivered the baby at that time by cesarean section for a non-reassuring fetal heart tracing with delivery before 23:00. Delivery at any time before 00:10 would have prevented the asphyxia, acidosis, hypoxic ischemic encephalopathy and permanent brain injury.

15

By 23:40, the standard of care required Nurse Tran to notify Dr. Jones of the variable decelerations and the decreased variability of the fetal heart rate. If Dr. Jones had been called and properly informed of the situation at 23:45, then the STAT cesarean section should and would have been called by 23:50, and the baby would have been delivered by cesarean section at or about 00:00 without any permanent harm. Alternatively, Dr. Jones could have performed a vacuum extraction at 23:55 and had the baby delivered by 00:00. In either scenario the baby would not have suffered injury as the baby would not have been exposed to another 15 to 20 minutes of a full umbilical cord occlusion and 15 to 20 minutes more of worsening acidosis.

From 00:00 to 00:20, the baby was suffering from a severe lack of oxygen due to a complete cord occlusion as demonstrated by the bradycardia beginning at 00:00 and continuing through the remainder of the fetal heart monitoring strip as well as the subsequent cord blood gas[s]es. It is well established in the medical literature that under these circumstances, brain injury will begin to occur within minutes and will progressively worsen on a minute-by-minute basis. Therefore, in the setting of a complete cord occlusion with bradycardia, the severity of the ultimate damage depends on how many minutes it takes for the baby to be delivered. In other words, the axiom "time is brain" applies. For those reasons, each of the delays in delivering the baby described above, including the two minute delay that resulted from the failure to move the mother to the OR at 00:06, caused and contributed to the ultimate injury suffered by the child.

It is my expert opinion that the above referenced deviations in the standard of care by Nurse Tran, Dr. Jones, the Hospital and the related entities, Texas Health Harris Methodist Hospital Southwest Fort Worth, and Texas Health Care, P.L.L.C., caused an unnecessary and preventable delay in the delivery of [the baby] which resulted in the baby becoming hypoxic, asphyxiated, severely acidotic and caused the hypoxic ischemic encephalopathy with long term cerebral palsy.

**Objections and Motion to Dismiss**

After receiving Dr. Balducci's amended expert report, Texas Health and Dr. Jones objected that his opinions and observations concerning Dr. Jones's alleged

breaches of the standard of care and the purported causal relationship between those breaches and E.D.'s permanent brain injuries were conclusory, speculative, and disconnected from the underlying facts. More particularly, Texas Health and Dr. Jones objected that the report does not show a demonstrable breach of the standard of care articulated by Dr. Balducci—that Dr. Jones failed to obtain accurate information from Nurse Tran about the fetal heart rate by asking her specific questions during the 22:29 call—because the report (1) never says what Dr. Jones and Nurse Tran actually talked about and, thus, does not identify what information Nurse Tran provided or did not provide concerning E.D.'s fetal heart rate tracings and (2) does not identify which, if any, of the questions Dr. Jones failed to ask and simply presumes that Dr. Jones did not ask any of these questions.

Concerning the element of proximate cause, Texas Health and Dr. Jones questioned Dr. Balducci's assumption that had Dr. Jones properly inquired into the baby's fetal heart rate tracings, Nurse Tran would have provided accurate information that would have led to an earlier delivery:

> Dr. Balducci's opinions amount to speculation and require the Court to engage in impermissible gap-filling. Dr. Balducci's opinions require the Court to assume that the nursing staff would have conveyed information to Dr. Jones that would have prompted him to perform an earlier C-section. But, Dr. Balducci does not identify what information the nurse would have conveyed or provide the basis for his opinion that the nurse "would have" provided the requisite information, as opposed to "should have" provided the information. Dr. Balducci is critical of the nursing staff throughout his report, claiming Nurse Tran failed to properly interpret the fetal heart rate monitoring, failed to contact Dr. Jones [at] appropriate times, and failed to provide pertinent

17

information to Dr. Jones. Yet, Dr. Balducci's causation opinions rest on the nurse['s] providing information to Dr. Jones. Chapter 74 requires more than unsupported speculation. [Footnotes omitted.]

Accordingly, Texas Health and Dr. Jones sought dismissal of the Parents' health care liability claims because Dr. Balducci's amended expert report failed to satisfy Chapter 74's requirements.

When the trial court overruled these objections to Dr. Balducci's amended expert report and denied the motion to dismiss, Texas Health and Dr. Jones filed this interlocutory appeal.

**Standard of Review**

Under Chapter 74 of the Civil Practice and Remedies Code, when a plaintiff files a health care liability claim, the plaintiff must serve an expert report that provides a fair summary of the expert's opinions regarding the standard of care applicable to the defendant health care provider, the manner in which the defendant's care failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6). If a plaintiff does not serve such a report, upon the defendant's motion, the trial court must dismiss the plaintiff's suit and award attorney's fees to the defendant. *Id.* § 74.351(b). When a plaintiff serves a report but the defendant asserts that the report is legally insufficient, the trial court must determine whether the report represents an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l*). To constitute a good faith effort, the report must (1) inform

the defendant of the specific conduct forming the basis of the claim and (2) provide an evidentiary foundation for the trial court to conclude that the claim has legal merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

An expert report need not marshal all of the plaintiff's evidence, but it must explain, to a reasonable degree of factual and professional specificity, how and why the breach caused the plaintiff's injury. *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 80 (Tex. App—Fort Worth 2018, pet. denied). "A bare expert opinion that the breach caused the injury will not suffice." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015)). "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

Moreover, although an expert may make reasonable inferences from the medical history, those inferences must be expressed and substantiated within the "four corners" of the report; a court may neither credit unsubstantiated inferences nor fill gaps in a report by drawing inferences or guessing as to what the expert meant or intended. *See Jepson v. Wyrick*, No. 02-18-00148-CV, 2019 WL 2042303, at *5 (Tex. App.—Fort Worth May 9, 2019, no pet.) (mem. op); *Estorque v. Schafer*, 302 S.W.3d 19, 25 (Tex. App.—Fort Worth 2009, no pet.); *Granbury Minor Emergency Clinic v. Thiel*, 296

19

S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.); *Benish v. Grottie*, 281 S.W.3d 184, 194–95 (Tex. App.—Fort Worth 2009, pet. denied). For example, when the only evidence of a material fact is circumstantial, "the expert cannot merely draw possible inferences from the evidence and state that 'in medical probability' the injury was caused by the defendant's negligence." *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). The report must "explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts." *Id.* As a result, when the facts support several possible inferences, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the factfinder why those inferences are more reasonable based upon verifiable medical evidence, not simply the expert's opinion. *See id.*

We review a trial court's ruling on the adequacy of an expert report for an abuse of discretion. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017). A trial court abuses its discretion when it makes a decision without using guiding rules or principles. *Id.* at 512–13. In applying the abuse-of-discretion standard, we may not substitute our judgment for the trial court's judgment. *Id.* at 513. In conducting our review, we always bear in mind that the Legislature's goal in requiring expert reports was to deter baseless claims, not block earnest ones. *Jackson*, 565 S.W.3d at 81.

20

## Analysis

In their only issue, Texas Health and Dr. Jones argue that Dr. Balducci's amended expert report did not provide a fair summary of his breach and causation opinions as required by Chapter 74. More particularly, as in the trial court, they assert that Dr. Balducci's report is conclusory and speculative in that, although he asserts that E.D.'s permanent neurological injuries directly resulted from Dr. Jones's failure to timely and properly inquire about, evaluate, and act upon accurate fetal heart rate information during the later stages of the mother's labor, he never actually sets forth any facts demonstrating such a failure or the probability that Nurse Tran would have given accurate information in response to such an inquiry. In response, the Parents contend the trial court acted well within its discretion in determining that Dr. Balducci's factual observations and professional opinions concerning Nurse Tran's and Dr. Jones's care—particularly, their alleged mutual failure to communicate concerning signs of fetal distress in the fetal heart rate tracings—constitute a good faith effort in support of their health care liability claims. Because Dr. Balducci's observations and opinions concerning Dr. Jones's alleged negligence and its consequences rely exclusively on a counterintuitive inference that Nurse Tran, a nursing historian that Dr. Balducci brands as demonstrably incompetent, would have given Dr. Jones accurate fetal heart rate information had he only asked the right questions, we agree that his amended report is both conclusory and speculative and thus that it is legally insufficient to support the Parents' health care liability claims.

21

"Texas nursing standards require both reporting and documenting of a patient's status, including signs and symptoms, as well as 'contacts with other health-care team members concerning significant events regarding a client's status.'" *Tomball Tex. Hosp. Co. v. Bobinger*, No. 01-18-00361-CV, 2019 WL 3801664, at *5 (Tex. App.—Houston [1st Dist.] Aug. 13, 2019, pet. filed) (mem. op.) (citing and quoting 22 Tex. Admin. Code § 217.11(1)(D)(i), (vi)). Accuracy and completeness are essential elements of the duty to report. 22 Tex. Admin. Code § 217.11(1)(D). And the duty to report frequently arises in time-sensitive situations. *See Bobinger*, 2019 WL 3801664, at *5 (upholding sufficiency of expert report opining that nurses' and physical therapists' failures to report post-operative patient difficulties to surgeon caused premature discharge); *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. Shelby*, No. 05-17-01358-CV, 2018 WL 6187437, at *5 (Tex. App.—Dallas Nov. 27, 2018, no pet.) (mem. op.) (upholding sufficiency of expert report opining that nurses' failure to timely report necrotizing change in condition of patient's leg required its amputation); *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 384–85 (Tex. App.—Dallas 2013, no pet.) (upholding sufficiency of expert report opining that delay in informing the doctors about the patient's visual changes following emergency heart surgery breached standards of care applicable to nurse and physical therapist).

In his amended report, Dr. Balducci details Nurse Tran's breach of her duty to accurately and completely chart E.D.'s fetal heart rate tracing. But in further attributing negligence to Dr. Jones, he assumes that, had Dr. Jones adhered to the

22

standard of communication articulated by Dr. Balducci—including his hypothetical cross-examination of Nurse Tran during the 22:29 call—Nurse Tran would have provided an accurate interpretation of the fetal heart rate tracings during the mother's labor and reported that accurate interpretation to Dr. Jones.[21] The amended report itself shows why this assumption is both conclusory and speculative.

To begin with, four of the six hypothetical questions urged by Dr. Balducci inquire into the presence and degree of any decelerations evidenced by the tracings during the 22:29 phone call. Yet the amended report fails to identify a single such deceleration occurring before that call. All of the decelerations Dr. Balducci critiqued occurred well after the 22:29 call; there were simply none for Nurse Tran to communicate to Dr. Jones during the call.

Similarly, the sixth of the hypothetical questions asks about the baseline of the fetal heart rate leading up to 22:29. But the amended report does not identify any aspect of the pre-22:29 baseline that should have been a cause for obstetrical concern. Indeed, the report expresses no concern about the baseline whatsoever until

---

[21]Dr. Balducci does not state what Nurse Tran and Dr. Jones talked about during the call other than "the patient's condition." Thus, he also presumes that Dr. Jones did not ask, and that Nurse Tran did not accurately answer, his proposed hypothetical questions. He does not opine that if Dr. Jones had asked those same questions, and if Nurse Tran had answered them accurately and completely, that Dr. Jones also breached a standard of care to accurately interpret and respond to the fetal heart rate tracing data. *See, e.g.*, *Schwartz v. Fipps*, 553 S.W.3d 549, 556 (Tex. App.—San Antonio 2018, no pet.) (noting that report is conclusory if it merely implies applicable standard of care rather than explaining what it is and how physician breached it) (citing *Scoresby v. Santellan*, 346 S.W.3d 546, 557 (Tex. 2011); *Palacios*, 46 S.W.3d at 880).

addressing the midnight bradycardic event evidenced by the precipitous drop from one hundred fifty beats per minute to fewer than fifty beats per minute.

Of the remaining questions in the hypothetical cross-examination, one asks about the presence of any accelerations, and the other asks about the presence and degree of variability in the fetal heart rate tracings. As to the former inquiry, the amended report notes simply that there were "no accelerations" evidenced at the time of the 22:29 phone call but articulates no material distinction between their absence at that time and the previous periods of absent accelerations noted earlier in the mother's labor that were of no obstetrical concern.

As a result, the only critical information that Dr. Jones could have elicited from Dr. Balducci's hypothetical cross-examination of Nurse Tran was the variability of the fetal heart rate tracings leading up to the 22:29 communication. According to the amended report, the tracings "transitioned" from "reactive" to minimal to "absent" variability from 20:33 until the time of the call. The report also concludes, repeatedly, that Nurse Tran failed to accurately interpret the variability in the tracings throughout the mother's labor, accusing her of "a critical lack of understanding concerning fetal heart rate tracing interpretation and management" and alleging that Harris Methodist Southwest was directly negligent as a consequence thereof. Indeed, according to Dr. Balducci, during the critical 23:40 to 23:57 time frame, not only did Nurse Tran fail even to chart two separate episodes of deep variable decelerations, what she charted—that the variability had *improved* from "minimal" to "moderate"—was

24

incorrect. As a result, the inference that Dr. Balducci draws—that his proposed hypothetical cross-examination would have prompted an accurate interpretation of the fetal heart rate tracings' variability from Nurse Tran during the 22:29 phone call—is not reasonable; it is speculative, counterintuitive, and conclusory. *See Ezekiel v. Shorts*, No. 14-12-00305-CV, 2013 WL 119712, at *1–2, *4–5 (Tex. App—Houston [14th Dist.] Jan. 10, 2013, no pet.) (mem. op.) (holding expert report critical of defendant obstetrician for failing to timely order emergency cesarean delivery insufficient because report failed to demonstrate labor and delivery nurses timely communicated prolonged variable decelerations to obstetrician); *see also Sy ex rel. Verderosa–Sy v. Brescia*, No. A–5434–11T3, 2013 WL 4104102, at *5 (N.J. Super. Ct. App. Div. Aug. 15, 2013) (not designated for publication), *certif. denied*, 216 N.J. 366 (2013) (holding insufficient expert report that failed to establish that labor and delivery nurse timely communicated significant abnormalities in fetal heart rate tracing to defendant obstetrician); *cf. Cannon v. Jeffries*, 551 S.E.2d 777, 779–81 (Ga. Ct. App. 2001) (upholding summary judgment for defendant obstetrician after delayed cesarean-section delivery when evidence failed to show that labor and delivery nurse informed him of "nonreassuring" fetal heart tones during telephone call).

Finally, Dr. Balducci's amended report concludes that, when first informed by the charge nurse of the midnight bradycardic event by telephone at 00:06, Dr. Jones's failure to immediately order the mother to the OR for a STAT cesarean delivery resulted in a two-minute delay proximately causing E.D. additional brain damage. As

25

an initial matter, Dr. Balducci is not sure when the call actually took place. He states three times—twice in his "Medical History" and once in his "Standard of Care"—that the charge nurse called Dr. Jones to the bedside at 00:06 or 00:07. He further equivocates over this one-minute difference when referencing Dr. Jones's arrival at 00:11 in relation to his communication with the charge nurse: "Dr. Jones arrived at the bedside at 00:11 (roughly 4–5 minutes after being notified) . . . ." Finally, when referencing the cesarean delivery at 00:20, he equivocates again, observing that the delivery occurred "approximately 13–14 minutes" after the charge nurse notified Dr. Jones. Despite these clear equivocations, Dr. Balducci later states categorically that the charge nurse communicated with Dr. Jones at 00:06.

Dr. Balducci further equivocates in his "Medical History" as to when Dr. Jones actually "called" for the STAT cesarean: "The STAT cesarean section was either called when he received [the] report from [the charge nurse] at 00:06 or 07 or upon his arrival at 00:11." There is no dispute that Dr. Jones "arrived at the bedside at 00:11" or that the mother was moved to the OR at 00:13. This appears to be the basis for Dr. Balducci's conclusion that Dr. Jones was responsible for the two-minute delay. According to this assessment, (1) the mother should have been moved to the OR at 00:06 when the charge nurse contacted Dr. Jones; (2) because the mother was not moved to the OR until 00:13, two minutes after Dr. Jones arrived at the bedside, Dr. Jones did not order the mother to the OR until he arrived at 00:11; and (3) as a result of the five-minute delay between the phone call and Dr. Jones's ordering the

26

mother to the OR, the delay for which he was responsible was two minutes. The incoherence of this conclusion demonstrates that Dr. Balducci is speculating about what transpired between Dr. Jones and the labor and delivery nurses once they contacted him about the midnight bradycardic event, as well as who was responsible for the delay, if any, in getting the mother to the OR.

Moreover, from a standard-of-care and proximate-cause standpoint, Dr. Balducci's own description of the expected time frame for delivering the baby by STAT cesarean or vacuum extraction excludes the possibility that Dr. Jones was responsible for a two-minute delay in delivery. As Dr. Balducci assumed, if the charge nurse communicated the bradycardic crisis to Dr. Jones at 00:06, he delivered the baby by STAT cesarean at 00:20, fourteen minutes after being notified. When discussing the time frame for delivery had Nurse Tran told Dr. Jones of the deep decelerations at 23:45, Dr. Balducci states categorically that "a STAT cesarean section should and would have been called by 23:50, and the baby would have been delivered by cesarean section at or about 00:00 without any permanent harm." Alternatively, Dr. Balducci offers "Dr. Jones could have performed a vacuum extraction at 23:55 and had the baby delivered by 00:00." Under either scenario, the actual STAT cesarean called and performed by Dr. Jones occurred within the fifteen-minute time frame, with one minute to spare. Or possibly even the critical two: "He delivered the baby by STAT cesarean section at 00:20. That is approximately 13–14 minutes from being notified and approximately 9 minutes from arrival."

Indeed, according to Dr. Balducci's stated time frame for the cesarean scenario, calling for a STAT cesarean five minutes after notification of the bradycardic event was within the standard of care. Even had Dr. Jones waited to call for the STAT cesarean when he arrived at 00:11, that is still only five minutes after he was first notified of the bradycardic crisis at 00:06. So in addition to speculating about what communication actually occurred between the charge nurse and Dr. Jones at 00:06, and whether Dr. Jones called the STAT cesarean then or when he arrived at 00:11, Dr. Balducci appears to have inferred a two-minute delay in delivery simply by subtracting 00:11 from 00:13, an inference that, applying his own responsive time frame, is unreasonable, speculative, and conclusory. *See Jelinek*, 328 S.W.3d at 536 ("It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury.").

Although Dr. Balducci's report clearly attributes every minute of delay in delivery to further, more severe injury to E.D., it also sets forth a reasonable time for the doctor to perform the delivery after being notified of the bradycardic event: fifteen minutes. It is undisputed that the nurses did not notify Dr. Jones of the bradycardic event until at least the 0:06 phone call, and he delivered E.D. fourteen minutes later. So the report itself shows that the two-minute delay could not have breached the standard of care articulated by Dr. Balducci.

For all of these reasons, we hold that the trial court abused its discretion by denying Dr. Jones and Texas Health's motion to dismiss.

## Conclusion

Having sustained Dr. Jones and Texas Health's sole issue, we reverse the trial court's order denying their motion to dismiss, render judgment dismissing the Parents' health care liability claims against them with prejudice, and remand this case to the trial court to assess Dr. Jones's and Texas Health's reasonable attorney's fees and court costs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)(1)–(2); Tex. R. App. P. 42.3(c), (d).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  March 5, 2020

29